**TEXAS AND NEW ORLEANS RAILROAD COMPANY, Appellant,**

v.

**Glenn W. FLOWERS, Appellee.**

**No. 6344.**

Court of Civil Appeals of Texas.

Beaumont.

May 19, 1960.

Rehearing Denied June 3, 1960.

Keith, Mehaffy, McNicholas & Weber, Beaumont, for appellant.

Harold Peterson, Beaumont, Jacobs, Davis & Schmidt, Houston, for appellee.

McNEILL, Justice.

This is a suit for damages which was instituted in the district court of Jefferson County by appellee against appellant because of alleged injuries sustained by him as a result of being struck and run over by a string of freight cars at a street crossing in the City of Beaumont. As a result of the trial before a jury, judgment in the sum of $170,802.20 was rendered in favor of appellee, hence this appeal.

Appellee, who had just left a house of ill-fame at the corner of Crockett and Orange Streets in the City of Beaumont, about 2:30 or 3 o'clock a. m., April 5, 1957, started to walk toward the business district of town which was situated some distance therefrom. He was not acquainted with the area into which he was going but stated that he saw the lights of the town and started in that general direction. His path lay along Cedar Street which runs generally in an easterly-westerly direction. The street was not paved and had no curbs and gutters, but had a hard surface with many holes from wear and travel. Walking easterly along this street, though he testified he did not realize it, he was approaching obliquely the southerly edge of appellant's switchyards, an area of considerable extent, the most southerly switch track in which began at a point somewhat east of the city viaduct and extended in a generally east direction in a mild curve to the right, crossing Cedar Street at a slight angle and terminating about 200 feet east of this street at the end of a building described as the Pre-Fab building. This switch track is known as the "outside caboose track." Cedar Street at the point of the crossing comes into and crosses the southerly edge of the railroad switchyard property, and bearing east, comes out of the property within a short distance. The part of Cedar Street involved, as it extended into and across a small part of the railroad property was, for the purpose of this case, recognized as a public street.

Appellee had walked along the northerly side of this street a distance of about a block and a half when he reached the east end of a high metal fence that ended in the center of Cedar Street. This end of the fence was covered with a heavy vine, which obscured one's vision. Appellee testified that as he went along he was watching where he was walking to keep from stumbling and immediately upon passing the east end of the fence and following Cedar Street walked upon this most southerly switch track crossing, not knowing it was there, and was struck in the left part of his back by a box car at the end of a moving string of freight cars, knocked down and the wheels of the eastmost box car ran over his two legs below the knees and across his right arm between the wrist and elbow, mangling them so that they later had to be severed. Describing his experience under the train he said "it rolled me back and forth." He further testified that he saw no freight cars before he was hit and heard no noise and the area was without lights; there were no signs, watchman nor flagman nor any other warning indicating that he was passing over a railroad track. The record shows that the track involved will

hold a maximum of about 10 freight cars; that it has a slight down grade to the east and that where it crosses Cedar Street the top of the track is at ground level.

The evidence further shows that immediately before appellee was run over there were several freight cars standing on this switch track to the west of the crossing. According to appellant's contention, which was supported by evidence, no freight car ever entered this crossing on the night in question and that appellee, instead of being on Cedar Street, had gone upon the track westerly thereof and had gotten himself involved with the freight cars. Appellee, however, contends, and the jury so found, that he was hit by a car while he was on Cedar Street crossing and that the cause of the accident was the switching crew on duty at the time in the west end of the yard "kicked" a freight car into the outside caboose track, propelling it sufficiently that it struck a string of cars standing thereby, causing them to start rolling across the Cedar Street crossing, striking appellee and causing his injuries. One of the trainmen said that a "kicked" car would not have to be kicked too hard into the end of a string of cars on the outside caboose track as they roll good on the slight down grade and the impact of the kicked car on the standing string of cars could cause them to start moving east across Cedar Street and roll toward the concrete bunker at the east end of the Pre-Fab building (S.F. 408). Whether the noise of such a contact with the standing cars would likely be loud would probably depend on several factors but this was not developed at the trial. The railroad yard was a large one but whether a person proceeding as plaintiff was approaching the crossing should realize he was at or entering the yard was a matter for the jury to say.

In answer to Special Issues the jury found (1) appellee was struck by a car at the street crossing involved; (1–A) he was struck while walking across this track on Cedar Street; (2) appellant's employees failed to keep a proper lookout for persons walking on Cedar Street near the crossing; (3) failure to keep a proper lookout was proximate cause; (4–A) the train crew "kicked" the 10th car into the outside caboose track before coupling on to the cars in said train; (5–A) appellee was struck immediately after the 10th car was "kicked" into the outside caboose track; (8) appellant's failure to place a warning sign that this track crossed Cedar Street was negligence; (9) its failure was a proximate cause of the occurrence; (13) appellant failed to have a flagman at the crossing at the time the 10th car was "kicked" into said track; (14) and that such failure was negligence; (15) and proximate cause; (16) in "kicking" the 10th car into the track instead of shoving it to a coupling was negligence; (17) and was a proximate cause; (Issue 32) appellee failed to keep a proper lookout for railroad cars and locomotives upon appellant's tracks at the time and place in question; (Issue 33) such failure to keep a proper lookout was not a proximate cause; (37) that the occurence was not the result of an unavoidable accident; (38) because of physical pain, mental anguish and loss of earning capacity he may suffer in the future he was awarded damages in the sum of $157,400; (39) that he sustained medical and hospital bills and expenses for artificial appliances; (39–A) this in the amount of $3,402.20; (39–B) appellee will in all reasonable probability incur future expenses for artificial appliances; (39–C) the amount there is $10,000.

Appellant's brief contains 9 points of error. Its 3rd–7th points are presented together. The third point asserts that the trial court erred in overruling appellant's motion for judgment notwithstanding the verdict. Appellee asserts that the point is too general to be considered since it is based upon assignments of error 1 and 2 in the Amended Motion for new trial which are also too general. These two assignments read:

"1. The Court erred in overruling this defendant's Motion for Judgment non obstante veredicto.

"2. The Court erred in overruling this defendant's Motion to disregard the findings of the jury to various Special Issues and to enter judgment for this defendant."

The motion non obstante veredicto and alternatively to disregard certain issues contained four paragraphs. The first, that the evidence is wholly insufficient to establish negligence on the part of appellant; the second that the evidence conclusively establishes that appellee was guilty of contributory negligence as a matter of law which proximately caused the occurrence; the third, the jury's answers to such of the issues 1, 1–A, 2, 3, 4–A, 5–A, 8, 9, 13, 14, 15, 16, and 17 are without support in the evidence, and the court should disregard each and all of them; fourth, the finding of the jury in answer to Issue 33 is without support in the evidence or so against the weight of the evidence as to be manifestly wrong. Though the assignments of error above quoted fail to mention or name in a specific or explicit manner the error complained of, required in Rule 320, Texas Rules of Civil Procedure and as defined in Collins v. Smith, 142 Tex. 36, 175 S.W.2d 407, it appears that as to errors complained of in a motion notwithstanding the verdict or motion to disregard certain issues Rule 324 controls, and the motion itself preserves the errors claimed therein. Tindall v. Tacconelly, Tex.Civ.App., 328 S.W.2d 909. The third point in appellant's brief under assignments 1 and 2, however, reads:

"Because the trial court erred in overruling appellant's motion for judgment notwithstanding the verdict, the judgment should be reversed and the cause remanded for a new trial."

This point perhaps is too general to be considered. Tindall v. Tacconelly, supra. But when the point is considered in the light of the statement and argument under the grouped points 3–7 the two questions dealt with are (1) there is no evidence to support the jury's finding to Issue 33, (2) the evidence is insufficient to support the jury's finding to Issue 33, and while it is doubtful that the second question is raised since bottomed entirely on the motion for judgment N.O.V.—Traders & General Ins. Co. v. Bass, 193 S.W.2d 848, by this Court—we will examine both. They are well presented in appellant's brief. Because of the nature of the question we have carefully examined the entire statement of facts, and have concluded that there is sufficient evidence to sustain the jury's answer to Issue 33. Appellant, we think, correctly poses the real question in this language:

"So, the only inference left from the jury finding is that the lighting was so poor that plaintiff was unable to see a large boxcar looming before him. Visibility was such that plaintiff could not perceive that he was even in the vicinity of many railroad cars—this is the implication from the jury finding."

In the light of this question we set forth in the next four paragraphs evidence in addition to what is set out above, particularily bearing on the question and the reasons for our conclusion thereon.

Testimony of witnesses as to night: It was described variously as "clear but dark", "really dark", "pretty dark, cloudy and cold" and "very clear". Whether the lights in the switchyard area shone helpfully at or near the Cedar Street crossing: (1) Willie McDaniel, a car cleaner for appellant and who lives in the house on Cedar Street near the crossing and abutting the fence covered with vines, testified:

"Q. Do you know of your own knowledge whether or not it is light or dark in the vicinity of that crossing at night time? A. Well, there is a light burning down there; it gives a pretty good light—over in the yard.

"Q. Where is that light you speak about? A. The one right there at Mrs. Kelly's house; that's the third house, where the stop sign is.

"Q. You mean the street light on Victoria Street? A. No: on Cedar St.

"Q. That is Cedar and Victoria? A. Yes, sir.

"Q. That's between your house and the signal house? A. Yes, sir.

"Q. And that is back away from this crossing? A. Yes, sir; it's the third house from my house.

"Q. The third house back towards the viaduct? A. Yes, sir; because they tore one of the houses down.

"Q. Right there at the crossing, Willie, there is no street light there, is there? A. No, sir."

(2) T. J. Martin (member of train crew known as "long field" man at east end of string of cars) testified:

"Q. If there had been a person around, was there sufficient light for you to have seen them? A. Yes, sir.

"Q. Could you have seen it was a person? A. Yes, sir; we could see people.

"Q. Did you have any difficulty seeing the steps or that grab iron? A. No, sir.

"Q. Your switchmen's lantern, is it just one of these little things? A. Well, it's considerably larger than a flash light; it's—what I would say 6 or 8 inches long, and about that big around.

"Q. If anyone had been around the end of that box car that you released the brake on, before that, would you have seen him? A. Yes, sir, I'm sure I would.

"Q. Was there anybody there? A. No, sir.

"Q. Is there any doubt about that in your mind at all? A. No doubt at all."

(3) Appellee testified "there wasn't no lights in that area. Q. Was it dark? A. Yes, sir." (P. 25) Again he testified: "I knew it was a train at the time it hit me. I could see the wheels." He was run over and mangled by the wheels when he was first knocked down (p. 52).

The witness Breitling formerly "pin puller" of appellant but at time of trial employed elsewhere testified he was working with the train crew and the movement last done before the movement to pull the 10 cars of the outside caboose track was to do some shoving of cars on the middle caboose track—the one immediately north of the outside caboose track.

Appellant's witness, T. J. Martin who was the long field man, testified that preparatory to the movement starting to pull the 10 cars out of the outside caboose track it was his duty to go to the east end of this cut of cars, which he did. He carried an electric lantern that gave forth a good light. He stated he climbed to the top of the box car at the east end to release the hand brake and having done this, he came back down the north side ladder, went around the east end of the car and stood there to give the engine foreman the signal to pull out so that he, in turn, could pass the signal on to the engineer in the engine at the west end of the cars. Mr. Martin noticed no one in the vicinity except the train crew. He stated when he first reached the end box car it was just west of the Cedar Street crossing; and as the coupling was made between the engine and the 10th (kicked) car and the coupling with the second car, these acts did not move the east end car eastward as much as an inch. When the signal to pull out was given Martin, with lantern in hand, mounted the stirrup of the end car, and Mr. Olsen was then about 2 cars east of the engine. When they had moved 3 or 4 car lengths Martin stated Mr. Olsen gave the "wash out" or emergency stop signal and the train then stopped in about a car's length. He came up to Olsen, who had been walking east toward Martin as the train moved west, and Olsen told him a man was under the

eastmost box car. Mr. Olsen stated, as he walked east and when about 4 cars had pass-him, he heard a bump. He shone his light under the car the sound came from and saw nothing wrong, but the next car east had what looked like a rag or piece of paper. He did not know what it was but it turned loose right in front of him. He realized it was a body and he gave the "wash-out" signal. The evidence placed appellee under the eastmost car when it came to a stand-still and this place was variously estimated from 100 to 200 feet west of the Cedar Street crossing.

Whether, under the evidence if appellee had been keeping such lookout for his own safety as an ordinary prudent man would have done under the circumstances, he would have avoided the accident we are un-able to say. In testing the evidence before us it is of such general nature we cannot say that reasonable minds would reach one conclusion upon it. Was the night "clear but dark", "really dark", or "very clear", whether the crossing area was lighted or dark and whether the "kicked" string of cars rolling along the slight slope eastward was making a noticeable noise as it came upon appellee are circumstances of such general nature that they are difficult to appraise. There was another switch crew working at the time in the easterly end of the yard. If we assume, as the evidence warrants, that the night was dark, no lights or other warning signs or signals given of the railroad crossing and the string of cars moved quietly upon appellee a proper lookout may not have availed him. The cars were approaching from an acute angle behind him. Even though at the time lights may have been shining back in the yard, cars switched and standing on the middle caboose track could have obscured his opportunity to discover the cars ap-proaching. Appellant argues that appellee should have at least seen the head light on the switch engine from the west when it came onto the outside caboose track to pull out the cut of 10 cars. However, it was shown that the 10th car was "kicked" onto

the track some time before the movement began to pull the string of cars out. Whether the 10th car was kicked shortly before the movement to pull out the cars is uncertain. The evidence will justify either view. At any rate, the jury found he was hit as the result of the kicked car and this being so, the headlight on the switch engine could not have warned him. The testimony of appellant's long field man that he re-leased the hand brake on the eastmost car as it sat just west of the Cedar Street crossing just before the movement to pull the cars out of the caboose track began, and that the east end of the train never extended easterly into or across Cedar Street, is contrary to the version of the accident as related by appellee. Both ver-sions cannot be true, and it was the jury's burden to decide between them. Points 3–7 are overruled.

■■■ Appellant's 8th point asserts that the court erred in failing to give a proper instruction on circumstantial evidence. The court's definitive instruction was:

"You are instructed that any fact be-fore you may be established by circum-stantial evidence or direct evidence, or both. A fact may be established by direct evidence when proved by wit-nesses who saw that acts were done or omitted or saw the conditions in ques-tion or heard the words spoken, or by documentary evidence. A fact may be established by circumstantial evidence when the existence of it is fairly and reasonably inferred from other facts proved in the case."

This instruction was excepted to on the ground that it did not require the jury to find any "other facts proved in the case" as used in this definition from a preponder-ance of the evidence. The instruction given is not subject to the complaint made. As stated in the instruction, the inference that may be drawn is from other "facts proved" in the case. The definition of the word "proved" in 73 C.J.S. p. 264 is: "In legal matters and proceedings the usual

and ordinary meaning of the word 'prove' is to establish; to render or make certain." This is the meaning to be ascribed to these words as used in the court's instruction. To prove a fact without a qualifying phrase is to make certain, to establish, to fix or settle unalterably. Hart v. Hart, Tex.Civ. App., 110 S.W. 91; Sumner v. Kinney, Tex. Civ.App., 136 S.W. 1192, 1195. The last sentence of the instruction we think placed a stronger requirement of proof than to find from a preponderance of the evidence, and this being so, appellant may not complain.

In view of our holding that the instruction on circumstantial evidence as given by the court was not subject to the objection made thereto, we do not feel required to discuss the question of evidence raised by appellant's argument under its 8th point to support the jury's finding in answer to Issue 4–A. However, because of the importance of the issue and the magnitude of the recovery based upon the finding in answer thereto and since appellee's brief has joined issue on the question, we will briefly notice it. Special Issue 4–A reads:

> "Do you find from a preponderance of the evidence that the defendant's train crew, operating the train in question, kicked the tenth car into the outside caboose track before coupling onto the cars in said train? Answer: We do."

Appellant contends because of its view that the explanation of circumstantial evidence was incomplete, the jury went far afield and found its answer to this issue entirely upon fallacious or unfettered conjecture, and asserts that the only evidence that the train crew had kicked the car into the outside caboose track is found in the testimony of Mr. Olsen, the engine foreman, and quotes the following excerpt from his testimony: "Q. Now I believe that before you make a shove movement on to the hold track, pushing those cars up there, you said was the move immediately before going into the outside caboose track to drag these ten cars out—did you make any kick movements of cars into the outside caboose track with the cars that you were going to pull out? A. Not in quite a while we hadn't put any in it. Q. How much time was it? A. Early in the night we had kicked one car in it * * *." In answer to this quotation appellee cites the following from Mr. Olsen's testimony:

> "Q. Where did you get this car you kicked into the track? A. It was on one of these trains.

> "Q. It would be pretty hard for you to remember now which particular move you picked it up and put it there. A. That's right.

> "Did you just kick it in there? A. Just kicked it in there.

> "Q. And you went on with your other switching? A. Yes, sir.

> "Q. And your next move was to go into the caboose track and drag it? A. The outside caboose track, yes, sir.

> "Q. The outside caboose track? A. Uh huh.

> "Q. Where were you when this move was made? A. Well, I rode the engine with the first car which wasn't tied on, and I walked down and made this particular coupling.

> "Q. That was the car that you had kicked into that— A. Uh huh.

> "Q. The coupling didn't make when you kicked it there? A. No, sir.

> "Q. How far apart were they? A. About a foot. Whether they hit and bounced back I don't know, because I was up by the viaduct and I don't know whether it just didn't make the joint when it hit, or whether—."

In addition to the conflicting statements of this witness, appellant's yardmaster Fitzpatrick testified that some 10 to 20 minutes before appellee was found run over on the track he (Fitzpatrick) had walked by the

cars in the outside caboose track checking them, and at that time none of the cars were blocking the Cedar Street crossing and that all of the cars on this track were together. When these items of testimony are considered, along with appellee's testimony, that the cars rolled him back and forth and "moved him every which way" and with the further fact that he lost little, if any, blood because his limbs were not severed but were mashed and mangled, we think the jury was at liberty to find the answer it did to the issue.

■ Appellant's 9th point asserts that the trial court erred in overruling its motion for mistrial when appellee's witness voluntarily and prejudicially injected "insurance" into the case. The witness, Charles W. Niezek, was at the time of the trial and for some 20 years preceding had been secretary and investigator for Mr. Wyatt Baldwin, one of counsel for appellee. He had been sent to Houston previous to the trial to talk to Beverly Manning Griffith, a person whom appellee and other young people were with on the night of and previous to the accident. Near the end of this very lengthy trial and when appellee was putting on rebuttal evidence, during direct examination of his witness Niezek the following took place:

"Q. Did you ask her any questions about what her testimony was going to be? A. Well, she said she would rather not go into that, inasmuch as she talked to some representative of the insurance company some two or three days previously.

"Q. Did you say insurance company? A. I mean the railroad company. Excuse me."

Immediately thereupon appellant moved for a mistrial on the ground that "insurance" was injected into the case. The court having refused the motion for mistrial, to which exception was taken, appellant then cross-examined the witness Niezek in this vein:

"Q. She did tell you that she had been talked to by one or more men representing the railroad? A. Yes, sir.

"Q. At that time? A. Yes, sir.

"Q. Did she tell you that she had given a written statement? A. I don't think she said that, Judge.

"Q. Did you ask her? A. No, sir.

"Q. You didn't ask her if she had actually given a written statement? A. No, sir. She said she was conferring with the railroad representatives, and so I told her, 'I'll make my call as brief as I can.'"

From all that may be learned from the record it appears that the reference by the witness to the "insurance company" was an inadvertent statement and was quickly corrected by the witness himself. Appellant asked for no instruction to the jury to disregard the reference to insurance or insurance company, and although appellee suggested a joint request be made to the trial court to instruct the jury that there was no insurance in the case, appellant did not accept it. In declining to accept the suggestion, counsel for appellant explained that he was of the opinion appellant was in fact protected by insurance and in the motion for mistrial made by counsel it was stated such partial coverage would be shown by competent evidence. The record, however, fails to show this was done. The point assigned does not reflect reversible error. Texas Textile Mills v. Gregory, 142 Tex. 308, 177 S.W.2d 938; Trice Contract Carpets & Furniture Co. v. Gilson, Tex. Civ.App., 329 S.W.2d 476.

■ The first point of error in appellant's brief is grounded upon the alleged error of the trial court in overruling its objection to argument of plaintiff's counsel, Harold Peterson, with reference to the amount of damages to be allowed by the jury for pain and suffering. Mr. Peterson, while simultaneously writing figures upon a blackboard placed before the jury, said:

"The Court asks you some other important questions in this issue. He asks you to compensate him—this is a hard thing for a jury to do—to compensate him for the pain and suffering he has had in the past and will have in the future. You have to do that from your human experience, from your common sense. But the law provides that he should be compensated for the pain in the past, that excruciating, agonizing pain he had from these injuries; that he be compensated, and that you, the jury, put a dollar sign on that pain, because he had to suffer it by reason of the occurrence, and by reason of the acts of this defendant; and the jury says—the Court says it is up to you, ladies and gentlemen, to compensate him, to put a dollar value on it. That is difficult to do, and I want to tell you what I think is reasonable. I say that for the first 30 days following these injuries, 21 days of it in Hotel Dieu, that it would be reasonable to give him for pain and suffering during those 30 days, $500.00 a day."

Thereupon counsel for appellant stated:

"Mr. Keith: If Your Honor please, I have objection, for the reason that it is opinion evidence on the part of counsel, and there is no criterion upon which counsel can argue; there is no testimony in this record on which he can predicate any such figure of $500.00 a day; it is improper, and prejucial.

"The Court: I overrule the objection.

"Mr. Keith: Note our exception."
Following this objection Mr. Peterson then placed another per diem figure upon the pain experienced after the first 21 days, after which Mr. Keith asked that his objection go to "all this argument of trying to put a value on mental anguish." Then continuing the argument Mr. Peterson stated:

"I would say that during that time to the date of this trial, it is reasonable to give him $10.00 per day for the pain and suffering that he has had when he was laid up there in the bed. And Glenn Flowers, Ladies and Gentlemen, does not try to be a cripple. He tries to go like an ordinary human being; when he walks, he does the best he can; he walks on those legs and does all he can. Now, I submit that during those 550 days that his suffering is worth $10.00 per day."

Appellant's argument upon this point is forceful and exhaustive. Many cases, both Texas and from our sister states, are cited and quoted. The burden of its argument is that since pain and suffering have no market price, it is error for counsel in argument to the jury to make suggestion thereof, especially putting a dollar mark on pain from day to day and from month to month, as this is, in effect, giving unsworn testimony. Some few early Texas cases have passed upon this question in a general way and seem to have given sanction to such argument. See Galveston H. & S. A. Ry. Co. v. Miller, Tex.Civ.App., 57 S.W. 702; Trinity & B. V. Ry. Co. v. Dodd, Tex.Civ. App., 167 S.W. 238. However, it remained for more recent times to show the full exploitation of this feature of a damage suit trial. There is reason both for and against allowing argument by counsel for a day to day and month to month value of pain and suffering. It has always been recognized in this state that a lawyer in arguing his case before a jury may suggest answers based upon his view of the evidence and may explain the method by which he reaches his conclusion. It would seem that suggesting some concrete formula, although it must be admitted to be purely a suggestion, in order to give the jury some basis to arrive at its verdict is preferable to leaving it entirely at sea to fix a damage figure en masse "by guess and by golly." The method followed by counsel in the instant case has, we think, been upheld in the very recent case of Continental Bus System, Inc.

v. Toombs, Tex.Civ.App., 325 S.W.2d 153 (writ ref. N.R.E.). To the same effect are Louisiana & Arkansas Ry. Co. v. Mullins, Tex.Civ. App., 326 S.W.2d 263, (writ ref. N.R.E.) and Kimbell v. Noel, Tex.Civ.App., 228 S.W.2d 980 (Ref. N.R.E.); Texas Employers' Ins. Ass'n v. Cruz, Tex.Civ.App., 280 S.W.2d 388 (ref. N.R.E.); Green v. Rudsenske, Tex.Civ.App., 320 S.W.2d 228 (N.W.H).

Appellant to sustain its point relies upon Warren Petroleum Corp. v. Pyeatt, Tex. Civ.App., 275 S.W.2d 216 (writ ref. N.R. E.). However, it appears in that case that the charts used were made before argument in the case began and set forth factual matters not supported in the evidence. We believe that case is not controlling as the jury in the present case undoubtedly considered Mr. Peterson's figures as mere argument or suggestion and not as evidence in the case. We think this is made clear in the latter part of the succeeding paragraph.

■ Appellant's second point urges that the verdict of the jury was excessive in allowing damages for pain and suffering, loss of wages and loss of future earning capacity in the sum of $157,400, and urges that the case be reversed and remanded or in the alternative that a remittitur be required as to the excess. While this opinion is already too lengthy, we feel required in view of the size of the verdict to describe briefly appellee's injuries sustained in the accident. At the time of his injuries appellee was 21 years of age and was doing common labor, working at the time for Bethlehem Steel Corporation, making $80 per week. He had finished the 10th grade in high school, had served a while in the Air Force and had worked at two or three other places, none of which indicated he was a steady worker. The facts previously stated show that he was hit and run over by a freight train, that both of his legs below the knee were so badly mangled that they were amputated and he has had to wear artificial limbs; his right arm below the elbow and wrist was also mangled and

he has to wear an artificial hand or claw. His pelvis bone, collar bone and wrist bone were broken and his lung was punctured. He was under the care of doctors and nurses in a local hospital 21 days, after which he was transferred to the Veterans' Hospital in Houston for operations to revise the stumps of his legs and to be fitted with artificial limbs and hand. He has had considerable trouble and pain wearing these limbs, cannot put them on without help and he is totally and permanently disabled; has difficulty feeding himself and at night when he has to go to the bathroom or other place without his artificial limbs he has to crawl. It goes without saying that he has suffered much physical pain, and mental anguish because of the lack of limbs. No attack is made by appellant on the findings of amounts for medical expenses and for allowance of $10,000 for future appliances and connected service. The attack is upon the award of $157,400 for pain and suffering, loss of wages and future earning capacity. Appellee has a wage earning life expectancy of 43 years and since he was hurt his hourly wage rate has increased 6.2 percent. If he had worked regularly for that expectancy he would have earned $4,250 per year totalling $182,750. Discounting this amount 25% for present value reduces his future loss of earning capacity to $137,062.50. Appellee had lost two years earnings at the time of trial which would total about $7,000. This therefore added to the discounted amount of $137,062.50 totals $144,063.50. The difference between this sum and $157,400 is $13,337.50, a relatively modest sum which could have been allowed for pain and mental suffering.

■ We have reviewed the present record in the light of similar cases and we have been unable to find any guide which very satisfactorily discloses to us our duty in connection with the matter here raised. In a somewhat similar case a judgment for $150,000 was upheld. Louisiana & Arkansas Ry. Co. v. Mullins, Tex.Civ.App., 326 S.W.2d 263. The amount recovered in the instant case is very large and appellant

suggests it could be invested in a savings and loan association at 4% per annum and yield the sum of $6,296 per year, one and a half times as much as appellee's yearly salary and, if he used the yearly income to live on, at the time of his death the original amount would still be on deposit, and he would thus have at life's end what the jury allowed him at the trial. But even if this would be so, considering the many vicissitudes of life, yet for one just reaching man's estate to be deprived of the effective ambulation given him by birth and to be deprived of the use of his right hand—thus making him so dependent on others for even the elementary things of life, and undoubtedly destroying for all time his earning capacity, and having been and being subjected to pain and embarassment—when these and the other factors hereinbefore pointed out are summed up— the amount allowed does not indicate to us passion or prejudice on the part of the jury. While we may have been inclined, had we been passing on the amount of damages, to have rendered a somewhat less amount, it is not proper.for this court on that ground only to substitute its judgment for that of the jury. The evidence fully warrants the judgment allowed, and it is affirmed.