136 So.2d 448 (1961)
Mrs. Hazel Jenkins LITTLE
v.
Mrs. Minnie Fay Powell HUGHES.
No. 5419.
Court of Appeal of Louisiana, First Circuit.
December 27, 1961.
*449 Porteous & Johnson, New Orleans, for appellant.
Sims & Mack, Hammond, for appellee.
Before ELLIS and HERGET, JJ., and MILLER, J. pro tem.
MILLER, Judge pro tem.
Mrs. Hazel Jenkins Little seeks damages from Mrs. Minnie Fay Powell Hughes for personal injuries resulting from an automobile accident which occurred on October 23, 1957 in Tangipahoa Parish. Mrs. Little was a guest passenger of Mrs. Hughes when Mrs. Hughes' vehicle was struck from the rear by an automobile operated by Mr. Vernon Simmons.
The suit was originally filed against State Farm Mutual Automobile Insurance Company and Mrs. Hughes, but plaintiff voluntarily *450 dismissed her suit against State Farm prior to trial. Notwithstanding this dismissal, the insurance policy showing that Mrs. Hughes had coverage in the sum of $10,000.00 for any one person injured was made a part of the record which went before the civil jury.
Jurisdiction existed in Livingston Parish by virtue of the fact that Mrs. Hughes resided in that parish at the time the suit was filed. The case was tried before a jury on February 23,1960 and after hearing the evidence, the arguments of counsel and the charge by the judge, the jury concluded that the plaintiff was entitled to judgment in the sum of $10,000.00. Judgment was granted in that sum and defendant has appealed.
For purposes of oral argument before this court, this case was consolidated with the case of Claude Frank Little v. State Farm Mutual Automobile Insurance Company and Mrs. Minnie Fay Powell Hughes, which was tried on October 8,1958 before the 21st Judicial District Court, Honorable H. R. Reid, presiding, in the Parish of Tangipahoa. Jurisdiction existed in that court by virtue of the fact that the accident occurred in Tangipahoa Parish. In the trial in Tangipahoa Parish, Claude Frank Little sought to recover medical and other expenses incurred as a result of the injuries sustained by his wife Mrs. Hazel Jenkins Little in the same accident. Mr. Little recovered judgment in the sum of $2,198.79 and the defendants appealed.
There are some procedural and incidental questions which are presented by this appeal, and we shall rule on these prior to considering the merits. The preliminary questions are:
(1) Is the discovery deposition of an adverse party admissible in evidence?
(2) Can civil jurors be peremptorily challenged and excused after having been accepted by both sides and after having taken their oath and their place in the jury box?
(3) Does the trial judge have the right to prevent counsel from reading from a lawbook during the course of his closing argument to the jury?
(4) Can a party argue to the jury the value of the plaintiff's claim by use of a previously prepared cardboard chart which attempted to place value by the hour on pain and suffering?
The discovery deposition of a party may be used by an adverse party for any purpose. LSA-R.S. 13:3745 so provided at the time this case was tried, and this provision of our law is now found in Section 2 of Article 1428, LSA-Code of Civil Procedure. Therefore the defendant's objection to the plaintiff's offering of the discovery deposition of Mrs. Hughes should have been overruled.
The Code of Civil Procedure which became effective January 1, 1961, provides in Article 1766 that no party has the right to challenge peremptorily after the entire jury has been accepted and sworn. However, there was no similar provision in the Code of Practice which was in effect at the time this case was tried. We think the trial judge had discretion to permit either party to exercise peremptory challenges prior to the taking of evidence in cases tried prior to January 1, 1961.
During closing argument to the jury the defendant's eminent counsel was attempting to quote from the case of Southern Farm Bureau Cas. Ins. Co. v. Caldwell, La.App., Ill So.2d 842, when the trial judge interrupted the argument and enjoined counsel from such action. Defendant contends that by this action, the learned trial judge kept from the jury a basic and intrinsic portion of defendant's summation; that the trial judge created in the minds of the jurymen the unerasable conviction that counsel for defendant had attempted to "put one over" on the plaintiff; that Articles 484 and 486 of the Code of Practice in effect at the time of the trial, do not restrict counsel except as to matters of courtesy and dignity and nowhere *451 therein are there placed any restrictions upon the contents or methods of presentation by counsel; that the error committed requires the setting aside of the verdict of the jury and the entering of a new trial. Neither counsel has cited any decisions concerning this question.
We do not think the trial judge erred in his ruling which prevented counsel from reading from a lawbook to the jury during his closing argument. The law applicable to this question at the time of the trial was Code of Practice Articles 515 and 516. At first blush, it would appear that the provision of Code of Practice Article 515, that
"The case shall be pleaded before the jury in the same manner as before the court; * * *."
would surely mean that counsel could quote from lawbooks in their argument to the jury, for it would be unheard of to prevent counsel from referring to lawbooks during his closing argument to the court. However, it should be noted that should the court, sitting without the jury, rule that counsel could not argue from a lawbook in his closing argument, this, per se, would not constitute reversible error. But just as it is rather difficult to understand how an attorney might give his closing argument to the court without the right to refer to a lawbook, it is also clear that in a civil jury trial an attorney cannot successfully contend that he has the right to delay his argument until he can get a transcript of the testimony, and further to have a delay within which time to prepare written briefs with the right to submit those briefs to the jury. Yet, each of these last mentioned privileges are regularly accorded to counsel for the submission of their cases before the court. So it appears clear that the provision that `The case shall be pleaded before the jury in the same manner as before the court * * *' is not without some limitation. And that limitation is set forth in the article which follows, and reads:
"Article 516. In this charge the judge must limit himself to giving the jury a knowledge of the laws applicable to the cause submitted to them * * *'. Since it is the duty of the judge to charge the jury as to the law applicable to the case, the court has the corollary right, should he desire to exercise it, to require that the jury gets only the correct law applicable to the case. In order to reduce the possibility of confusing the jury, the trial judge has the right to decide what law is applicable to the case and to prevent counsel from arguing other law. Should the attorneys have the right to cite and quote from cases which are in their view apposite to the case, but which are distinguishable by the court, the force and effect of the court's charge is diminished in the minds of the jury and the opportunity for confusion is increased. The jury might well conclude that the law read by counsel from a lawbook is more likely to be the law applicable to the case than is that which is read by the judge from a typewritten charge. Furthermore, opposing counsel would have no opportunity to read the cited cases so that he could make a proper effort to distinguish them during the course of his argument to the jury.
When counsel reads from lawbooks, it is essential that some facts be stated to show the similarity and dis-similarity to the case at bar. To this extent, counsel would be taking advantage of the evidence which had been offered in the cited cases, and by so using this evidence and reading the legal principles stated by the court in relationship thereto, counsel would be arguing that the decision of the court in those cases was controlling of the facts involved in the case before the jury. According to the annotation in 77 A.L.R. at page 653, it is stated that the majority rule is that the correct practice is for the trial court to refuse to permit lawbooks to be read to the jury since such a practice might tend to confuse rather than to aid the jury in its determination of the facts and that in civil cases *452 questions of law are exclusively for the court and questions of fact for the jury.
In Roberts v. Cooper, 61 U.S. 467, 15 L. Ed. 969, the United States Supreme Court stated that it is the province of the court to instruct the jury as to the principles of law affecting the case and that counsel could not appeal to a jury to decide legal questions by reading cases to them. Other cases in point are Clark v. Iowa Cent. R. Co., 1913, 162 Iowa 630, 144 N.W. 332; Hughes v. General Electric Light & Power Co., 1900, 107 Ky. 485, 54 S.W. 723; Baltimore & Ohio R. Co. v. Kean, 1886, 65 Md. 394, 5 A. 325; Watkins v. Boston and N. R. Co., 1927, 138 A. 315; Williams v. Brooklyn Elevator R. Co. 1891,26 N.E. 1048; Lewter v. Lindley, Tex.Civ.App.1905, 89 S.W. 784; Blum v. Jones, 1894, 23 S.W. 794; Olney v. Boston & M.R. Co., 1904, 59 A. 387. Also see discussion at 2 Ruling Case Law, Argument of Counsel, Sec. 2, p. 422.
We do not wish to be understood as holding that counsel cannot argue to the jury the law which the court has ruled is applicable to the case. Counsel will have ample opportunity to learn what law the court considers applicable to the case by virtue of the provision of LSA-C. of C.P. Article 1793 (and so far as the record shows, this was the procedure followed in this case) which requires that the court inform counsel of its action upon the requested charges prior to counsel's argument to the jury. Since the trial judge has an opportunity to study the requested charges, and to refuse to give those that are incorrect, the two parties are thereby assured that the jury will be in a better position to understand the law applicable to the case, than the jury would be if both parties undertook to read lawbooks to the jury and distinguish the holdings of the different cases. Having been informed as to the law which the court will include in its charge to the jury, counsel is thus enabled to argue the applicable law. Furthermore, since all counsel and the court know what law will be charged to the jury, counsel is able to object should opposing counsel make arguments outside the law which the court has ruled is applicable to the case, and the court can intelligently rule on the objection. Thus, we have an orderly procedure within the complete control of the trial court as distinguished from the situation likely to develop when neither opposing counsel nor the court has any advance notice as to what cases or authorities will be referred to during closing argument.
Even if we were disposed to hold that it was error for the learned trial judge to prohibit counsel for defendant to read from a lawbook in his closing argument to the jury, we still find that defendant would not have been harmed nor prejudiced by such error. The jury verdict, both as to the findings of facts and the application of the law to the facts so found, are reviewable by this court. The ruling complained of did not keep any material fact away from the jury and defendant has had full opportunity to present the applicable law to this court. We would not be justified in remanding this cause for a new trial when we are in a position to adjudicate this matter from the record made up in the trial court.
We do not agree that defendant was prejudiced by the eminent trial judge's ruling that the plaintiff could argue to the jury the value of the claim of plaintiff by the use of a previously prepared cardboard chart which attempted to place value by the hour on pain and suffering. The defendant would have us adopt the minority rule expressed in the case of Botta v. Brunner, 26 N.J. 82, 138 A.2d 713, 60 A.L.R.2d 1331. However, we believe that the majority rule permits counsel to employ this type of argument. Such was permitted in: Haycock v. Christie, 1951, 101 U.S.App.D.C. 409, 249 F.2d 501; Kindler v. Edwards, 1955, 126 Ind.App. 261, 130 N.E.2d 491; Four-County Electric Power Ass'n v. Clardy, 1954, 221 Miss. 403, 73 So.2d 144, 44 A.L.R.2d 1191; J. D. Wright & Son Truck Line v. Chandler, Tex.Civ.App.1950, 231 S.W.2d 786; Seaboard Air Line R. Co. v. Braddock, Fla. *453 1957, 96 So.2d 127; Kimbell v. Noel, Tex. Civ.App.1950, 228 S.W.2d 980; Etna Oil Co. v. Metcalf, 1944, 298 Ky. 706, 183 S.W. 2d 637, 639; Flaherty v. Minnesota & St. Louis Ry. Co., 1958, 251 Minn. 345, 87 N.W.2d 633, 635; Boutang v. Twin City Motor Bus Co., 1956, 248 Minn. 240, 80 N.W.2d 30, 39; Texas & N.O.R. Co. v. Flowers, Tex.Civ.App.1960, 336 S.W.2d 907, 916, 917; Ratner v. Arrington, Fla.App. 1959, 111 So.2d 82, 89; Clark v. Hudson, 1956, 265 Ala. 630, 93 So.2d 138; McLaney v. Turner, 1958, 267 Ala. 588,104 So.2d 315; Johnson v. Brown, 1959, 75 Nev. 437, 345 P.2d 754; Jones v. Hogan, 1960, 56 Wash. 2d 23, 351 P.2d 153; Olsen v. Preferred Risk Mutual Ins. Co., 1960, 11 Utah 2d 23, 354 P.2d 575; Miller v. Loy, 1956, 101 Ohio App. 405, 140 N.E.2d 38; Pennsylvania Railroad Co. v. McKinley, 6 Cir., 288 F.2d 262, 266,267.
When such argument is permitted by the trial judge, the defendant is entitled, upon request, to have the trial judge give a cautionary instruction advising the jury that the per diem estimates and blackboard or chart computations are not evidence nor exhibits, but constitute mere argument by the attorney. There is no showing that, if such a charge was requested, the trial judge refused to give it.
The remaining issues presented by this appeal are:
(1) Was Mrs. Hughes negligent? If so, was this negligence a proximate cause of the accident?
(2) If the plaintiff is entitled to recover, was the award excessive?
The only two witnesses to the accident who testified were the defendant, the driver of the car struck from the rear, and her guest passenger, the plaintiff. The driver of the overtaking car, Mr. Vernon Simmons, was an out of state resident who took employment outside the United States prior to the trial of the case. There was a joint stipulation entered in the record that there should be no presumption against either of the two parties for their failure to locate and present Vernon Simmons.
Both plaintiff and defendant were employed at a shirt factory in Hammond and completed their day's work at 2:45 p.m. on October 23, 1947. Both were living in Ponchatoula as of that date and Mrs. Little had been riding with Mrs. Hughes to and from work for the preceding year and seven months. On her way back to Ponchatoula, Mrs. Hughes drove her 1950 Chevrolet business coupe at a speed of about 35 to 40 miles per hour. She was driving in a southerly direction on U. S. Highway 51, a hard surfaced two lane concrete road between Hammond and Ponchatoula. She arrived at a point approximately threefourths of a mile north of Ponchatoula at about 3:30 p. m. during a heavy rain, after having passed Mr. Simmons who was driving his 1954 Ford in the same direction. This passing maneuver was accomplished approximately one mile north of the site of the accident. Mrs. Hughes intended to make a left turn into a road (hereinafter called the short-cut road) which makes a T-type intersection with U. S. 51 threefourths of a mile north of Ponchatoula. As she approached the short-cut road, Mrs. Hughes applied her brakes to slow down so that she could make the left turn as soon as the oncoming traffic would permit. The manner in which she applied the brakes to slow down or to come to a stop is one of the principal questions of fact to be determined. When she had slowed to about five miles per hour, according to defendant, or just as she came to a stop, according to plaintiff, the overtaking vehicle ran into the right rear bumper of Mrs. Hughes' 1950 Chevrolet, with the left front bumper of the overtaking vehicle. Mrs. Hughes was then approximately two car lengths north of the intersection and in her proper lane of traffic. Mrs. Hughes testified that she had her foot on the brake pedal immediately before the accident, but released the brake when she heard the brakes of the overtaking vehicle squealing. After the impact, Mrs. Hughes' vehicle rolled forward a distance *454 of approximately 40 to 80 feet and came to rest in its proper lane of travel after Mrs. Hughes applied her brakes.
Mrs. Hughes admits that she did not make any effort to signal her intention to slow down or to make a left turn until she had slowed from an estimated 35 to 40 to an estimated 5 miles per hour, and had reached a point about two car lengths north of the short-cut road. At that time she was just beginning to roll down the window of her car so that she could give a hand signal when she was struck from the rear. Her car was not equipped with the blinking signals to indicate a left turn, and she was depending on the brake lights to signal the fact that she was slowing down. The record indicates that the short-cut road is not visible to southbound traffic until you are almost on it and there is no showing of any highway markers notifying the traveling public of the existence of this T-type intersection. Although Mrs. Hughes maintains that she knew she would turn left on the short-cut road, that fact that she didn't see fit to even prepare to give a signal indicating the left turn until she was 40 feet from the turn and after she had slowed to five miles per hour leads us to believe that the weather conditions had obscured her vision and that she arrived at the shortcut road before she expected it. Under these circumstances it would be natural for the defendant to make a sudden stop.
During the countless times that the plaintiff described the slowing maneuver performed by Mrs. Hughes, plaintiff was fairly consistent in testifying that "It all seemed like it happened at one time, her stopping and the car hitting from behind." On some occasions plaintiff testified that "she (Mrs. Hughes) put on the sudden stop" and that the stop caused plaintiff to be thrown to the front. Opposed to this, the defendant was fairly consistent in denying that the stop was sudden. However, Mrs. Hughes consistently refused to give any estimate as to the distance between the point where she first applied her brakes and the site of the accident. And on one occasion, Mrs. Hughes testified that "I had my brakes on and they were squealing and his (the overtaking vehicle) brakes were squealing." In reviewing the records in both of these cases, we cannot conclude that the jury and the trial judge committed manifest error in believing the testimony that the defendant did in fact make a sudden and admittedly unsignaled slow down or stop on the highway for the purpose of waiting for the oncoming traffic to pass so that she could make a left turn.
It is our view that the overtaking vehicle was so close to Mrs. Hughes at the time she made the unsignaled sudden slowdown or stop on the highway, that this negligence constituted a proximate cause of the accident. The close proximity of the overtaking vehicle is indicated by the testimony of both parties that the accident occurred either at the same time that Mrs. Hughes stopped (to take the plaintiff's view) or while she was still moving forward at five miles per hour with her brakes released only an instant before the collision (to take the defendant's view).
We find the case of Shockley v. Norvell-Wilder Supply Co., La.App., 49 So.2d 51, 52, similar to the facts of the instant case. The court was there concerned with the question of negligence on the part of the lead vehicle which was brought to a sudden and abrupt unsignaled stop intending to negotiate a left-hand turn into a private driveway as soon as a slackening of oncoming traffic would permit. The following vehicle was being operated at some 15 to 20 miles per hour, the same speed as the lead vehicle and at a distance of some 20 to 30 feet. The court concluded that:
"In the instant case defendant's driver (of the lead vehicle) was chargeable with the responsibility for extreme caution under the circumstances. He was preparing to make the dangerous maneuver of a left hand turn, not at an intersection but into a private driveway, and in bringing his vehicle to a stop prior to negotiating such a maneuver *455 it was his duty to ascertain that this could be done without endangering the following traffic. His failure to observe plaintiff's automobile and to keep it under observation while bringing his own vehicle to a stop, in our opinion, constitutes an additional factor of negligence on his part."
While Mrs. Hughes was not preparing to make a left turn into a private driveway, the record shows that the short-cut road is not indicated by highway markers and is not visible to southbound traffic on U.S. 51 until the traffic is almost at the intersection.
Although the case of Graves v. Riser, La.App., 62 So.2d 163, 165, involves an accident where the lead vehicle was in the process of making the left turn when struck by the overtaking vehicle, the court was there concerned with the defendant's failure to give a signal. There the driver of the lead vehicle observed the trailing vehicle when it was 200 feet behind, yet the lead driver did not give his hand signal until he was about to turn left. The court found that the collision occurred almost immediately after the lead driver gave a signal for a left turn, and that the failure to give an earlier signal constituted negligence, saying:
"We have no doubt that the emergency thus created was the proximate cause of the accident * * *."
Mrs. Hughes was negligent in making an unsignaled sudden stopping maneuver on the highway for the purpose of making a left turn into a relatively obscure T-type road at a time when the overtaking vehicle was close behind. This negligence was a proximate cause of the accident.
The cases relied on by the defendant are distinguishable on the facts. In Southern Farm Bureau Cas. Ins. Co. v. Caldwell, La. App., Ill So.2d 842, the court concluded that the driver of the overtaking vehicle saw the lead vehicle preparing to stop on the highway 100 yards ahead of her. Furthermore, the Court saw fit to disregard cited cases involving abrupt stops for the reason that such factual issue was not present in the Caldwell case. The case of Pelt v. Home Indemnity Company, La. App., 118 So.2d 148 involved an accident where the lead vehicle had given a signal for some 200 to 300 feet before attempting to turn. The driver of the overtaking vehicle did not see it because he was engaged in turning on the windshield wipers with a pair of pliers. There is no showing in the Pelt case that the lead vehicle made a sudden stop. The case of Greer v. Ware, La. App., 187 So. 842, concerned an overtaking vehicle attempting to pass a school bus which was being operated down the middle of a gravel road. There was no showing or turning maneuver involved. In the case of Adam v. English, La.App., 21 So.2d 633, the Court specifically held that the lead vehicle came to a gradual stop.
On the question of damages, we note that the vehicles involved did not appear to have serious damage. Nevertheless the record indicates that Mrs. Little did suffer a rather severe blow. Mrs. Hughes took Mrs. Little in her car from the scene of the accident to the Clinic of Dr. Glenn T. Scott in Ponchatoula. Dr. Scott administered a shot for pain and ordered an ambulance to take Mrs. Little to the Baton Rouge General Hospital for observation and treatment by Dr. Alvin Stander, an orthopedic surgeon of Baton Rouge, Louisiana. Dr. Stander's testimony is the only medical testimony in the record, and the direct examination was limited to approximately one page of the transcript. On that one page, Dr. Stander testified:
"Mrs. Little when examined at that time (on admission) suggested a possibility of a contusion or bruise of the spinal cord. Examination was such that it did not fit any definite pattern and Mrs. Little had had a history of injury to the neck and was complaining considerably of pain in the neck."

*456 * * * * * *
"* * * diagnosis on that admittance was a whiplash injury of the neck and lumbo sacral strain and multiple contusions and abrasions."
Mrs. Little was in the hospial for 15 days with the first 7 or 8 days in continuous traction and the remaining week was spent in and out of traction for a few hours at a time. After Dr. Stander discharged Mrs. Little from the hospital, he saw her in his office on nine visits. On July 23, 1958, he was of the opinion that Mrs. Little had made a very gratifying recovery from her injury, and gave her a final discharge with instructions to return should she have further difficulty. She never returned.
On July 18, 1958, Mrs. Little submitted herself to Oschner Clinic in New Orleans for examination in connection with her complaints resulting from the accident, but has not seen fit to seek testimony from any of the physicians who examined her on that occasion.
Mrs. Little used a wheel chair and crutches for a short while during her convalescence. However, there is no medical evidence to show that this was necessary. On the contrary, Dr. Stander noted that Mrs. Little used crutches on her November 18th, 1957 visit to his office, and he noted on his records that "there was no valid reason for the use of the crutch at that time."
Mrs. Little testified that she stayed in bed for two weeks after she was discharged from the hospital and for an unknown length of time used a wheel chair and crutches to get about at home. She wore a neck collar for about three months. During the time she was in the hospital and for several months thereafter, she required her mother's services to help look after four of her children and to take care of her. She considered her mother a practical nurse, although the record makes it clear that her mother had no special training as a nurse. Mrs. Little contended at the time of the trial that she was still having trouble with her low back; that she can't stoop and get up unless she has something to support her and to pull herself up and that she still suffers a "dead aching pain" when there is a "change in the weather or something like that." The medical testimony does not confirm these complaints.
Plaintiff contends that the injuries suffered by Mrs. Little were essentially similar and commensurate to those of the plaintiffs in LeBourgeois v. Indiana Lumbermen's Mutual Ins. Co., La.App., 101 So.2d 720; Marcantel v. Southern Farm Bureau Casualty Ins. Co., La.App., 102 So.2d 879, and more severe than those suffered by the plaintiff in the case of Pelt v. Home Indemnity Co., supra. We cannot agree with plaintiff's counsel, for a reading of the cited opinions will show that there was much medical testimony in each case which substantiated the plaintiff's contention that the injuries were more severe and were still causing some disability at the time of the trial.
As was pointed out in the case of Wainwright v. Globe Indemnity Co., La. App., 75 So.2d 554, 556:
"Awards made in similar cases of damages for personal injuries are considered by the Court, so that within the limits permitted by the particular facts, a degree of uniformity will be maintained, so far as possible, to the end that awards will not be out of all proportion one with the other."
We find the injuries suffered by Mrs. Little to be somewhat similar to those suffered by the plaintiffs in the cases of Lawrence v. Great American Indemnity Co. of New York, La.App., 107 So.2d 338. where the plaintiff was awarded $3,500.00 for pain and suffering, and Kingery v. Fire Association of Philadelphia, La.App., 117 So.2d 619, where the plaintiff received $3,500.00 for her injuries.
After a careful consideration of the comparative awards made by the courts and of the injuries sustained by plaintiff *457 as disclosed by the record, we have concluded that the award of $10,000.00 is excessive and it should be reduced to $3,500.00, which amount we believe to be adequate but not excessive.
For these reasons, the judgment of the district court is amended to that the damages awarded to the plaintiff are reduced to $3,500.00, and in all other respects, the judgment appealed from is affirmed.
Amended and affirmed.