516 So.2d 452 (1987)
Howard K. SCHWAMB, Jr. and Mary P. Schwamb
v.
DELTA AIR LINES, INC., Jane Doe, Mary Doe, Richard Smith, and Dudley Anderson.
No. 86 CA 0508.
Court of Appeal of Louisiana, First Circuit.
November 10, 1987.
Rehearing Denied January 5, 1988.
Writs Denied March 11, 1988.
*455 Paul H. Dué, L.D. Sledge and Charles Wm. Roberts, Baton Rouge, Joseph H. Simpson, Amite, for plaintiffs-appellants.
Francis G. Weller and James Hahn, New Orleans, for defendant-appellant Delta Air Lines, Inc.
Paul G. Preston, New Orleans, for defendant-appellant Harley E. Sexton, III.
Esmond Phelps, II, New Orleans, for defendant-appellant McDonnell Douglas Corp.
Donald O. Collins and Vivian Madison, New Orleans, for defendant-appellant Heath Tecna Aerospace.
Nadine Ramsey, New Orleans, for defendant-appellant Nat. Fire Ins. Co.
Before EDWARDS, WATKINS and LeBLANC, JJ.
WATKINS, Judge.
Howard K. Schwamb, Jr. was injured on a Delta Air Lines flight when a briefcase fell from an overhead luggage bin onto his head. After trial, the jury found that Delta was solely liable for Schwamb's injuries *456 and awarded damages for lost earnings, general damages, and damages for Mrs. Schwamb's loss of consortium. It awarded nothing for Schwamb's loss of anticipated profits from a proposed business project.
We find that a trial court error tainted the jury verdict as to liability; however, our independent review of the record convinces us that Delta was solely liable. We find no manifest error in the jury awards concerning lost earnings, loss of anticipated profits, and loss of consortium. However, we find the award for general damages clearly excessive and reduce it. We find no reversible error in the trial court's rulings concerning plaintiffs' counsel's closing argument, the exclusion of two letters of compromise, jury instructions, interest or damages for future losses, and expert witness fees.

INTRODUCTION
On the evening of September 29, 1983, Dudley Anderson, Howard K. Schwamb, Jr., and Michael Crow were involved in a discussion on a Delta Air Lines flight. The three were returning to New Orleans from a business trip to Chicago and were seated on the right or starboard side of the DC9 aircraft, in the first row of coach class seats. Anderson, the corporate treasurer of G.H.R. Energy Corp. ("Good Hope") was in the aisle seat; Schwamb, a vice president in charge of construction and engineering at Good Hope, was in the center seat; and Crow, Good Hope's outside counsel, was in the window seat.
As the plane began its descent into New Orleans, another passenger, Harley E. Sexton, III, rose to get his coat from the luggage bin above Anderson, Schwamb and Crow. After Sexton depressed the latch, a briefcase fell from the bin, struck Schwamb on the head, and knocked Schwamb's head to the tray table in front of him. The plane landed in New Orleans within a half hour and Schwamb then drove home to Ponchatoula, Louisiana.
Schwamb awoke the next morning with a headache, a lump on his head, and soreness in his neck, shoulders and left arm. He saw his family physician that day and, when his arm and left leg started to become numb, Schwamb was taken to a hospital where he remained for about a week. After his discharge, Schwamb continued physical therapy, but complained of persistent pain and dizziness. He was examined and treated thereafter by a number of physicians, but was unable to return to work.
Howard Schwamb and his wife, Mary, brought the present lawsuit against: Harley Sexton (the passenger who opened the bin) and his insurers; Delta Air Lines, Inc. and its insurer; and Diane Manget (one of the flight attendants).[1] Plaintiffs sought damages for Howard Schwamb's physical pain and suffering, loss of earnings, and loss of anticipated business profits from a proposed real estate project, as well as for Mrs. Schwamb's loss of consortium. Delta and the flight attendant filed a third party demand against Sexton.[2]
After a two-week jury trial in Tangipahoa Parish, the jury returned a verdict against Delta Air Lines alone, finding that Harley Sexton and the flight attendant, Diane Manget, were not negligent. The jury then awarded damages for: past and future physical pain and suffering; past and future mental anguish; disability; past and future medical expenses; past and future loss of earnings; and past and future loss of consortium, services and society. The jury awarded nothing for Schwamb's claimed loss of profits from the proposed project.
Delta and its insurer appealed suspensively. Plaintiffs answered the appeal with *457 respect to the dismissal of Schwamb's claim for loss of profits, and appealed devolutively the dismissal of their claims against Sexton and his insurer.
The following issues are before us: (A.) Did the trial court improperly permit plaintiffs' witness to give his opinion as an expert? (B.) Is Harley E. Sexton, Jr. liable for plaintiffs' injuries? (C.) Is Delta Air Lines liable for plaintiffs' injuries? (D.) Did the trial court improperly permit plaintiffs' counsel to use a "cartoon" and make an allegedly prejudicial remark in closing argument? (E.) Did the trial court improperly exclude two letters written by Schwamb to Delta, as letters of compromise? (F.) Did the trial court give erroneous jury instructions? (G.) Did the jury award excessive general damages, lost earnings and damages for loss of consortium, and did it err in awarding plaintiffs nothing for loss of anticipated business profits? (H.) Did the trial court award excessive witness fees?

A. TESTIMONY OF PLAINTIFFS' EXPERT
Delta contends that the trial court made two errors with respect to the testimony of plaintiffs' expert witness, Charles O. Miller. It first contends that plaintiffs failed to supplement their interrogatory answer concerning the substance of Miller's testimony and that the trial court should therefore have stricken his testimony. For reasons discussed below, we disagree. Delta's second contention, which we do agree with, is that the trial court erred in permitting Miller to state his opinion as to the cause of the accident and the credibility of another witness.

Failure to Supplement Interrogatory Answers
In response to Delta's interrogatory request for the identity of each expert to be called and the general nature of his testimony, plaintiffs identified C.O. Miller as their only expert witness three weeks before trial. They indicated that the general nature of Miller's testimony would be "design defects of luggage compartment." However, at his deposition six days before the start of trial, Miller testified primarily about Delta's operational negligence (e.g. its inadequate safety procedures) rather than about design defects. Delta then filed a motion to strike Miller's testimony about operational negligence, and engaged its own safety expert. The trial court denied Delta's motion at the start of trial; Miller then testified exclusively about operational negligence.
We agree that plaintiffs breached the obligation under LSA-C.C.P. art. 1428(1) to supplement their interrogatory answers, which continued up to the date of trial.[3]Buxton v. Evans, 478 So.2d 736, 739 (La.App. 3d Cir.), writ denied, 479 So. 2d 921 (La.1985). However, a trial judge is given "great discretion in deciding whether to receive or refuse the offered testimony of witnesses and any bias must be in favor of receiving the testimony." Coignet v. Deubert, 413 So.2d 253, 256 (La.App. 4th Cir.1982).
Here, Delta deposed Miller six days before trial began, at which time it learned the substance of his trial testimony. Delta obtained its own expert witness before trial, but chose not to call him. The substance of Miller's testimony, that Delta's negligence had caused the accident, had been alleged in plaintiffs' petition and was not an issue new to the case. Finally, Delta chose not to seek the less drastic alternative of a continuance. See, e.g. Belk v. Montgomery Ward & Co., 501 So. 2d 1008, 1014 (La.App. 2d Cir.1987). Compare Lodrigue v. Houma-Terrebonne Airport *458 Comm'n, 450 So.2d 1004, 1006 (La. App. 1st Cir.1984). We find that, under the circumstances, Delta was not unfairly prejudiced and the trial court did not abuse its discretion in refusing to strike Miller's testimony.

Expert Opinions
The trial court accepted Miller as an expert in aeronautical engineering, aviation accident investigation and reconstruction, human factors, crash survivability, safety engineering, and safety management. Miller testified at length and gave his expert opinion about Delta's "operational negligence," that is, the failure to recognize and correct the risk presented to passengers by improperly loaded overhead luggage bins. Delta contends that this testimony was improper. For the reasons below, we disagree.
Delta's theory was that Sexton had dislodged the briefcase when he reached into the luggage compartment to retrieve his coat. Sexton, and plaintiffs, on the other hand, contended that the compartment had been improperly loaded or overstuffed, and that the briefcase fell out at the instant Sexton opened the luggage bin.
However, Mr. Miller was also permitted, over objection, to testify and give his expert opinion about the central factual issue in the case, the cause of the accident. Miller was also permitted to state his opinion about the credibility of another witness in the trial, Harley Sexton.
Miller was permitted to make the following remarks on the cause of the accident: "The question arises whether the bin was overstuffed and that was the force, if you will, that brought the suitcase out, or whether Mr. Sexton in reaching in or whatever, had a role in having that briefcase come out. I believe the former is what happened." This opinion was based on Sexton's statement that the bin door sprang open when he depressed the latch and that he was surprised when the briefcase fell out. Miller also remarked: "Because, given validity to the surprise ... I don't know and I don't know anyone else who knows the reason how this could happen, unless the bin was overstuffed." Plaintiffs' counsel then asked if one possible cause for the accident was that the bin was overstuffed and the briefcase came out under force when Sexton opened the bin. Miller replied: "That's certainly in my judgment the more probable than not possibility."
Miller was also permitted to comment on Sexton's credibility: "To my knowledge, he had no reason to hide or say[objection by Delta's counsel]Anything [at the time Sexton made his earlier statement about the accident]." On cross examination, Sexton's counsel asked whether Miller was suggesting that Sexton's version of the accident was untruthful or impossible. Miller's reply, which was objected to by Delta's counsel, was: "I have no reason to believe it was untrue ...on the contrary, I have reason to believe his testimony in this courtroom was valid based on that earlier statement."
We agree with Delta that these remarks were improper and unfairly prejudiced it.
To warrant the use of expert testimony, two elements are required; these concern the subject of the expert's opinion or inference, and the qualifications of the tendered witness, respectively. First, "the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond the understanding of the average layman." State v. Wheeler, 416 So.2d 78, 80 (La.1982) (emphasis added).[4] Second, "the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier of fact in his search for truth." Id.; McCormick on Evidence § 13 at 33 (Cleary 3d ed. 1984). The inquiry is: "On this subject can a jury *459 receive from this person appreciable help?" J. Wigmore, Evidence § 1923 at 29 (Chadbourn rev. 1978) (emphasis in original). If not, the testimony is superfluous, and is excluded to save time and avoid confusion. Id., § 1918 at 11.[5]
There are several variables which the trial judge should consider in deciding whether to admit expert testimony. First, the opinion rule operates to prefer more concrete description by a witness to the less concrete, the direct form of statement by a witness to the inferential. Second, the purpose for which testimony is admitted should have an effect upon the degree of concreteness required. If admitted as to collateral matters, evidence in general terms may be received with relative freedom. However, as to more crucial matters, approaching the hub of the issue before the fact-finder, concrete details rather than abstract references or opinions are required. Third, the preference for direct, concrete testimony and the reluctance to admit opinions and inferences as to matters crucially at issue are somewhat relaxed if the opinion or inference to be expressed may be classified as expert testimony. State v. Wheeler, supra, 416 So.2d at 80, 82; McCormick on Evidence, supra, § 12 at 26.
Testimony in the form of an opinion or inference otherwise admissible should not be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. See State v. Birdsong, 452 So.2d 1236, 1242-43 (La.App. 2d Cir.), writ denied, 457 So.2d 1200 (La.1984); Gage v. St. Paul Fire & Marine Ins. Co., 282 So.2d 147, 151-52 (La.App. 3d Cir.), writs denied, 284 So.2d 602 (La.1973); Bonilla v. Arrow Food Distribs., Inc., 202 So.2d 438, 444, 447 (La.App. 4th Cir.), writ denied, 251 La. 399, 204 So.2d 577 (1967). See also McCormick on Evidence, supra, § 12 at 31, § 13 at 33. However, before such opinions can be admitted, expert testimony must be warranted and admissible, and its probative value must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See, e.g., State v. Ludwig, 423 So.2d 1073, 1078 (La.1982); State v. Stucke, 419 So.2d 939, 945 (La.1982); State v. Moore, 278 So.2d 781, 786 (La.1973) (on reh'g).
A trial judge has broad discretion in determining who should or should not be permitted to testify as an expert and whether expert testimony is admissible; his judgment will not be disturbed on appeal unless manifestly erroneous. See State v. Trosclair, 443 So.2d 1098, 1105 (La.1983); Brown v. Morgan, 449 So.2d 606, 608 (La.App. 1st Cir.1984).
As to Miller's testimony about airplane safety and operational negligence, we find no error. The subject was sufficiently beyond the understanding of the average layman, and was so likely to assist the trier of fact, as to warrant expert testimony. In addition, Miller's knowledge and experience in the field of safety and human factors was a sufficient basis for qualifying him as an expert on that subject.[6]
*460 However, Miller's "expert" testimony about the cause of the accident and about Sexton's credibility was improper. The subject of Miller's inference about the cause of the accident was not beyond the understanding of the average layman and was, therefore, superfluous. The issue was essentially one of credibilitywhether Sexton's version of the accident was believable. The jury was equally capable of evaluating the significance of Sexton's claim of surprise. Common sense leads to the conclusion that Sexton would have been equally as surprised had he dislodged the briefcase while retrieving his coat. It may well have been permissible for Miller to testify that, assuming the validity of Sexton's testimony, Sexton's version was possible. It was improper for Miller to state his opinion as to the cause, under the circumstances. On the facts of this case, no "accident reconstruction" was needed. Moreover, the testimony was admitted, not on a merely collateral question, but rather at the hub of the issue before the jury, and was lacking in direct, concrete supporting details.
Miller also essentially told the jury that Sexton was truthful in saying that he had not dislodged the briefcase. Opinion evidence may not be received as to a matter upon which the jury can make an adequate judgment. The jury can adequately assess credibility and it is the jury's exclusive province to do so. In any event, Miller was not qualified to give an expert opinion on the credibility of another witness. See, e.g., United States v. Azure, 801 F.2d 336, 339-41 (8th Cir.1986); State v. Myers, 382 N.W.2d 91, 95 (Iowa 1986). See also Proposed L.C.E. art. 608, comment (c); Proposed L.C.E. art. 702, comment (e).
Jury findings of fact are usually not disturbed by the appellate court unless manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). However, when the trial court has made a consequential but erroneous jury instruction, or ruling on the exclusion or admission of evidence, the jury verdict is tainted and is not entitled to a presumption of regularity. McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986); Thomas v. Missouri Pac. R.R. Co., 466 So.2d 1280, 1284 (La.1985); Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975). In such a case, the appellate court must make an independent review of the record before it and render judgment on the merits. Id.[7] Those factual findings which were not affected by the erroneous instruction or ruling are entitled to the usual standard of review (manifest error). Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Ryland v. Taylor, Porter, Brooks & Phillips, 496 So.2d 536, 542 (La.App. 1st Cir.), writ denied, 497 So.2d 1388 (La.1986). The erroneous admission of Mr. Miller's opinions tainted the verdicts concerning Sexton's and Delta's liability; we must therefore determine liability from our independent review of the record, without according any weight to those opinions. The jury verdicts concerning damages were not tainted and will be examined under the usual manifest error standard.

B. SEXTON'S LIABILITY
The major factual dispute at trial was whether Sexton had dislodged the briefcase by pulling his coat from the luggage compartment, or whether the briefcase fell before Sexton grabbed his coat. The only direct evidence of the former came from Michael Crow and was, at best, equivocal. Crow was the only witness who saw Sexton open the compartment. On cross examination, Crow stated that he saw the briefcase fall out of the compartment and had a "vague recollection that maybe there was something else coming out as well." He then affirmed his earlier deposition testimony that:

*461 [I]t seems like [Sexton] was trying to take a coat out or he was reaching in there for something. Of course, that's a logical conclusion. If he was opening it, he was reaching in for something, but I have some recollectionsome vague recollection that, you know, he was reaching for something and a coat kind of vaguely is in my mind.
Crow also repeated his earlier deposition testimony that: "When [Sexton] was opening [the compartment], it was almost simultaneous, and I've got this vague recollection of him opening it and having a coat in one hand and as the briefcase was falling and me thinking what's he getting his coat for now."
Crow testified, however, that he had no specific recollection of a coat in Sexton's hand and stated that "the whole idea of a coat may have been a conclusion." He testified that "less than a second" elapsed between Sexton's reach for the compartment door and the briefcase's fall. Crow also stated that he would absolutely not testify that Sexton's version was inaccurate or untrue.
In contrast to Crow, Sexton was unequivocal. He stated that he got up to get his coat and had a bag of books in his right hand as he opened the bin with his left. He remembered:
[R]eaching over to open the latch on the bin and when I did it came out of my hand and the briefcase falling out. I remember more than just that item falling because it was such a surprise, I remember catching something else, but the briefcase come out. I just couldn't stop it. And it struck [Schwamb] directly on the head.
Sexton stated that he lost his grip on the door when it sprang open. On the facts before us, it was not proven by a preponderance of the evidence that any negligent act by Sexton was the legal cause of Schwamb's injuries. We will now examine Delta's responsibility for the accident.

C. DELTA'S LIABILITY
Delta denies that its negligence was the legal cause of the accident. Specifically, it contends that the bin was not in fact overstuffed, that warnings and inspections of the bins would not have averted the accident, and that it had no legal duty to conduct such inspections or give such warnings.

Burden of Proof
With proof of injury to a fare-paying passenger on a common carrier and failure to reach his destination safely, the plaintiff establishes a prima facie case of negligence, and the burden shifts to the defendant to overcome the prima facie case. At this point, the carrier must show that the incident did not occur, that it was without the slightest degree of negligence in discharging the plaintiff, or that any negligence on its part was not the legal cause of the plaintiff's injury. Galland v. NOPSI, 377 So.2d 84, 85-86 (La.1979); Davis v. Owen, 368 So.2d 1052, 1055 (La. 1979); Wise v. Prescott, 244 La. 157, 151 So.2d 356, 359 (1963).
Schwamb, a fare-paying passenger on Delta's flight, proved that he was injured in flight and failed to reach his destination safely. Plaintiffs therefore made out a prima facie case of negligence which Delta had the burden of overcoming.

Duty of Common Carriers
A public carrier of passengers is not the insurer of its passengers' safety. It is, however, required to exercise the highest degree of vigilance, care and precaution for the safety of those it undertakes to transport. The carrier must do all that human sagacity and foresight can do under the circumstances, in view of the character and mode of conveyance adopted, to prevent injury to its passengers. Galland v. NOPSI, supra, 377 So.2d at 85; Davis v. Owen, supra, 368 So.2d at 1055; Wise v. Prescott, supra, 151 So.2d at 359. The reason for the high degree of care required of common carriers is the notion that one who is in the business of providing transportation for a fee should be a more professional transporter than the "reasonably prudent" person with respect to hazards associated with the transportation of passengers. *462 Rodriguez v. NOPSI, 400 So.2d 884, 887 (La.1981).
Nor is a common carrier the insurer of its passengers' safety against the acts of third persons. Hurst v. NOPSI, 478 So.2d 1361, 1363 (La.App. 4th Cir.1985). However, when one passenger is injured by the negligence of another, with respect to a hazard associated with the transportation of passengers, the high duty of care is violated if the carrier or its employees had reason to anticipate or foresee that injury might occur but failed to take practicable action to prevent it. See Rodriguez v. NOPSI, supra, 400 So.2d at 887; Dupree v. Louisiana Transit Management, Inc., 441 So.2d 436, 439 (La.App. 2d Cir.1983), writ denied, 445 So.2d 1233 (La.1984); Burnell v. Sportran Trans. Sys. Co., 421 So.2d 1199, 1202 (La.App. 2d Cir.), writ denied, 423 So.2d 1183 (La.1982); Skipper v. NOPSI, 338 So.2d 771, 772-73 (La.App. 4th Cir.1976). If so, any negligence, however slight, will subject the common carrier to liability even assuming the concurring negligence of a third party contributed primarily to the accident. Burnell v. Sportran Trans. Sys. Co., supra, 421 So.2d at 1202.

Causation
On the record before us, we believe it more probable than not that Anderson's briefcase fell on Schwamb because the overhead bin was overstuffed or because the briefcase was dislodged in flight. As mentioned above, Sexton stated that the briefcase fell suddenly when he opened the bin. The bin was over the bulkhead seats of the plane. The testimony at trial indicates that, for a number of reasons, this bin has a particular tendency to become overstuffed and Delta knew or should have known of the problem. As the first bin in the passenger section, it was a convenient place for boarding passengers to stow their baggage. This particular bin was above six passenger seats. Because there is no seat in front of the bulkhead for passengers to store luggage under, the bulkhead bin is more likely to be used for storing their carry-on items.
The evidence indicates that, at a minimum, the bin contained Anderson's briefcase and fold-over garment bag, and Sexton's fur-lined coat. Sexton didn't remember who closed the bin and testified that he was not the last passenger to board in St. Louis. However, when he opened the bin on the plane's approach to New Orleans, Anderson's briefcase fell out and an object, which may have been another briefcase, also fell.
In addition, Miller testified that luggage stowed in overhead bins can easily become dislodged in flight so as to fall against the inside door of the bin. For example, when a hard object (such as a briefcase) is placed on a soft, unstable object (such as a garment bag), the top object will be relatively unstable and is likely to be dislodged by acceleration of the plane on take-off or by in-flight turbulence.

Breach of Delta's Duty
Under these facts and circumstances, we do not believe that Delta has overcome the plaintiffs' prima facie case of negligence. The risk which Mr. Schwamb was exposed to was a hazard associated with the transportation of passengers, imposing the highest duty of care on Delta. The scope of Delta's high duty of care to its passengers extends to protect this plaintiff from this type of harm arising in this manner. Delta did not prove that it did all that human sagacity and foresight could have done under the circumstances to prevent the accident, nor did it prove itself free from the slightest degree of negligence. A foreseeable risk of harm was present to Mr. Schwamb by overstuffing of bins and the movement of stowed luggage in flight. Delta knew or should have known of the danger presented, but failed to take reasonable and available steps to minimize the risk of harm.
For example, Charlain Hubbard Taylor, one of the flight attendants, knew that the overhead bins were, at times, overstuffed by passengers. She had heard of incidents where luggage had fallen from the bins, and had witnessed another incident in which a passenger was struck on the head *463 by a falling briefcase. Gail Maloney, another flight attendant, stated that in her six years with Delta, she had seen pillows, blankets and coats fall out of the bins. Although Diane Manget, the third flight attendant, denied knowledge of similar incidents, she was confronted with two Delta publications she admitted having read, which reported an increase in the number of such incidents.
At the time of the accident, in September of 1983, Delta flight attendants made two general announcements to passengers concerning carry-on baggage, but did not specifically give a warning to passengers about the risk associated with improperly loaded or overstuffed bins.[8] After the passengers were seated and before takeoff, the flight attendants were responsible for walking through the cabin and shutting any open overhead bin doors. Delta did not require them, however, to check inside the bins, and did not require the flight attendants to open any bins that were already closed. Delta did not require its flight attendants to redistribute the luggage if a bin was overstuffed or improperly loaded or stowed. No special regard was given the luggage bin above the bulkhead seats. If a passenger was unable to find a place for his luggage in an overhead bin, a flight attendant could check the luggage. Nancy Kilch, stated that Delta just relied "on the good judgment of a passenger not to close [the bin] when it is not correctly filled." Passengers were not restricted from placing garment bags in the overhead bins.
Miller testified that there were steps readily available to Delta which would at least have minimized, if not eliminated, the risk that Schwamb was exposed to. (1) A pre-boarding announcement to passengers about how to load the baggage; e.g. "Put the heavy things on the bottom, the lighter things on top." (2) A pre-boarding announcement to passengers to stow their baggage but not to close the doors. If the doors were open, flight attendants could come down the aisle before takeoff and check each and every one of the bins without having to take the time to open closed bins. (3) A pre-boarding inspection of carry-on baggage, in which flight attendants checked the volume of the luggage as well as its weight. (4) An on-board announcement by the flight attendant to passengers, e.g., in conjunction with the safety briefing concerning oxygen masks and emergency exits. (5) A warning on the plastic safety card which says something such as: "Be careful; don't overload bins and use caution when you use them." (6) A warning or illustration depicting the proper way to pack an overhead bin. (7) A pre-landing announcement to passengers concerning the removal of baggage from the overhead bins. (8) An announcement or warning while taxiing to the arrival gate when the vast majority of passengers are still seated, to the effect that passengers need to be cautious when opening the bins.
In light of the facts and circumstances of this case, we do not believe that Delta carried its burden of exonerating itself from liability.

D. SUMMATION OF PLAINTIFFS' COUNSEL
In closing argument, plaintiffs' counsel showed the jury a magazine advertisement or cartoon,[9] which had not been admitted in evidence, as an example of how easily Delta could have warned its passengers of the danger presented by overstuffed or improperly loaded overhead luggage bins. At another point in his summation, plaintiffs' counsel remarked that Delta was "counting *464 on cheap justice in Tangipahoa Parish." Delta objected to the cartoon and remark and made a motion for a mistrial, which the trial court denied.
Counsel has great latitude in argument before a jury, subject to regulation and control by the court, whose duty it is to confine argument within proper bounds. Temple v. Liberty Mut. Ins. Co., 330 So.2d 891, 894 (La.1976). It is within the discretion of the trial court to permit counsel to illustrate his or her remarks to the jury with reasonable demonstrative aids, such as blackboards, charts, models, sketches and the like, as long as such aids are relevant, and are not unduly inflammatory, misleading or prejudicial.[10] See Bossier v. DeSoto Gen. Hosp., 442 So.2d 485, 495 (La.App. 2d Cir.1983), writ denied, 443 So. 2d 1122 (La.1984); Starks v. Kelly, 435 So.2d 552, 554 (La.App. 1st Cir.1983); 88 C.J.S. Trial § 177 (1955). We do not believe the trial court abused its discretion in permitting plaintiffs' counsel to clarify his argument with the cartoon. Had its counsel requested one, Delta would have been entitled to an admonition to the jury that the aid was not evidence. Little v. Hughes, 136 So.2d 448, 452-53 (La.App. 1st Cir.1961).
The propriety of counsel's closing argument must be determined in the light of the facts of the particular case, the conduct and atmosphere of that particular trial and the arguments of opposing counsel. Luquette v. Bouillion, 184 So.2d 766, 771 (La.App. 3d Cir.1966). Although plaintiffs' counsel's remark may well have been improper, under the facts of this case, it did not justify granting a new trial. Moreover, in its final instructions, the trial court cautioned the jury that counsel's argument was not evidence, and that the defendant and plaintiffs should be treated as equals. See Temple v. Liberty Mut. Ins. Co., supra, 330 So.2d at 894.

E. SCHWAMB'S LETTERS TO DELTA
Delta contends that the trial court erred in excluding from evidence two letters written by Schwamb to Delta's President before this suit was filed. The letters were offered to "impeach" Schwamb's statement that he had not contacted Delta after the accident to get money for his proposed real estate project.
The letters were clearly offers to compromise Schwamb's personal injury claim against Delta. Although such offers may be admissible to impeach the credibility of a witness, they are generally excluded from evidence for policy reasons. See Dutton v. Guste, 387 So.2d 630, 632-33 (La. App. 1st Cir.1980), rev'd on other grounds, 395 So.2d 683 (La.1981). "The basic reason for this privilege of admissibility is the policy danger of discouraging compromises, favored by laws, if they can be used adversely to the compromiser in other proceedings." Broussard v. State Farm Mut. Auto. Ins. Co., 188 So.2d 111, 121 (La.App. 3d Cir.), writ refused, 249 La. 713, 190 So.2d 233 (La.1966), cert. denied, 386 U.S. 909, 87 S.Ct. 855, 17 L.Ed.2d 783 (1967). See F.R.E. 408.
We find no abuse of discretion by the trial court in excluding the letters from evidence. In any event, the jury awarded Schwamb nothing for his loss of acticipated profits, the issue on which the letters were presumably most relevant.

F. JURY INSTRUCTIONS
Delta contends that the trial court erred in failing to fully use thirteen of its proposed jury instructions and in giving form instructions proposed by plaintiffs. Because this court rather than the jury decided the issues of Delta's and Sexton's negligence, we will address only those instructions concerning damages.
"It is well-settled that adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. The adequacy of a *465 jury instruction must be determined in light of the jury instructions as a whole. If the court gives misleading, confusing instructions or omits an applicable legal principle, then such instructions do not adequately set forth the law and may constitute reversible error. The manifest error standard of appellate review may not be ignored unless the jury charges were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts." Laborde v. Velsicol Chem. Co., 474 So.2d 1320, 1324 (La.App. 3d Cir.1985), writs denied, 480 So.2d 738 (La.1986). See also Lincecum v. Missouri Pac. R.R. Co., 452 So.2d 1182, 1190-91 (La.App. 1st Cir.), writ denied, 458 So.2d 476 (La.1984).
Delta's proposed instruction # 6A concerned the jury's evaluation of the witnesses' testimony and credibility, a subject which was fully and accurately covered by the court's instructions. Delta's proposed instruction # 29 concerned the jury's evaluation of Mrs. Schwamb's claim for loss of consortium. The charge given by the trial judge properly and fully instructed the jury as to this claim. In addition, we find that the trial judge properly refused to instruct the jury that a party claiming damages for loss of consortium must offer proof in addition to his or her own subjective testimony.
The remainder of Delta and plaintiffs' instructions concerned Schwamb's loss of future earnings and loss of earning capacity. The trial court did not err in instructing the jury that, in determining damages for lost earnings, the calculation is to be made on gross earnings rather than net earnings. See, e.g., Harper v. Liggett Group, Inc., 459 So.2d 1260, 1263 (La.App. 1st Cir.1984), writ denied, 462 So.2d 655 (La.1985); Reeves v. Louisiana & Ark. Ry. Co., 304 So.2d 370, 376-77 (La.App. 1st Cir.), writ denied, 305 So.2d 123 (La.1974). We also find no error in the trial court's full and accurate instructions concerning damages for loss of earnings. A trial judge may, but need not, instruct the jury in a civil damage suit to affirmatively apply a discount factor and to consider inflation. There was no abuse of discretion in permitting the jury to use the total offset method for calculating lost future earnings. See e.g., Philippe v. Browning Arms Co., 395 So.2d 310, 316-17 (La.1981) (on reh'g).

G. DAMAGES

Causation of Injuries
The judgment of the fact finder on the matter of causation of injuries sustained in the accident must be affirmed unless it was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). We are not the ultimate trier of fact; rather, the jury is the ultimate trier of fact, and we are to reverse only in the case of manifest error. Riley v. Winn-Dixie Louisiana, Inc., 489 So.2d 931, 935 (La. App. 5th Cir.), writs denied, 494 So.2d 329 (La.1986).
Schwamb was seen by a number of physicians, some in Tangipahoa Parish and others in Orleans and Jefferson Parishes. With few exceptions, the testimony of these physicians contains basic medical facts upon which the jury's finding of causation could reasonably be premised.
Dr. Starns, a general practitioner who was Schwamb's personal physician, saw Schwamb on September 30, 1983, and noted weakness in the left arm and a lump on the top of the head.
Dr. M. Laughlin Winkler, an internist, saw Schwamb at Seventh Ward Hospital on the night of September 30, 1983, and found weakness of the left arm combined with a decrease in the radial pulse of the left artery as compared with the right artery.
Dr. John Schumacher, a neurosurgeon, examined Schwamb the next day and twice thereafter. Dr. Schumacher hospitalized Schwamb for acute cervical strain, but thought Schwamb should have been able to return to work within a week of October 14, 1983. Dr. Schumacher's testimony stands almost alone in the minimizing of Schwamb's complaints.
Dr. David M. Jarrott, a neurosurgeon, first saw Schwamb on November 7, 1983. *466 He found weakness of the left tricep, nerve irritation of the neck, and cervical and lumbar disc problems, which he thought probably had existed undetected before the accident, but which first became symptomatic after the accident. In addition, Schwamb complained of altered speech, dizziness and poor balance, headaches, and blurred vision in the left eye.
Dr. Kenneth Adatto, an orthopedic surgeon, first saw Schwamb on January 17, 1984, and noted he was involuntarily shaking and twitching all over. He noted a mild orthopedic problem, but felt the major problems were slurred speech and constant shaking. He referred Schwamb to Dr. Richard Palmer, a neurologist.
Schwamb complained to Dr. Palmer of headaches, pain in the neck which radiated into both shoulders, shaking, weakness on the left side, low back pain, intermittent dizziness, and difficulty with concentration and with his memory. Dr. Palmer performed an electromyogram and nerve conduction tests on Schwamb, which disclosed a mild nerve disease. Dr. Palmer stated that loss of consciousness was a symptom of concussion, and gave his opinion that Schwamb had momentarily lost consciousness at the moment his head was struck by the briefcase, and suffered from post-concussion syndrome. Dr. Palmer referred Schwamb to a psychiatrist, Dr. Oliver Sanders, Jr.
Dr. Sanders thought Schwamb was suffering from clinical depression with anxiety, which was related to the injury and Schwamb's inability to return to his formerly active life. Dr. Sanders noted that Schwamb had also complained of poor balance, occasionally uncontrollable shaking, memory lapses, and buzzing in the left ear.
Schwamb also saw Dr. Wallace Rubin, an ear, nose, and throat physician (otolaryngologist). Dr. Rubin noted a partial loss of hearing in the intermediate ranges which was especially bad in the left ear. He also noted poor balance. Dr. Rubin placed Schwamb on a restricted diet to alter his body chemistry, which Dr. Rubin testified has a marked effect on hearing and balance.
Finally, Schwamb saw Dr. Ralph Maxwell, an opthalmologist, who found a deficit in the superior (upper) field of vision, which was likely to become worse as time passed.
All of the physicians with the possible exception of Dr. Schumacher thought that the injuries they noted arose directly from the accident, that they were disabling, and that Schwamb's inability to resume his work as an engineer was of indefinite duration.
Thus, we hold the jury was not clearly wrong in finding that Schwamb's physical and mental condition were caused by the fault of Delta as the evidence furnished a strong basis for such a finding.
We will now examine the quantum awarded by the jury for these injuries.

Amount of Damages
The jury made the following awards in determining the quantum of damages:

To Mr. Schwamb:
Past physical pain and suffering $ 50,000.00
Future physical pain and suffering 100,000.00
Past mental anguish 20,000.00
Future mental anguish 20,000.00
Disability 200,000.00
Past medical expenses 20,000.00
Future medical expenses 10,000.00
Past loss of earnings 200,000.00
Future loss of earnings 360,000.00
Loss of profits from proposed project 0
To Mrs. Schwamb:
Past lost or impaired consortium,
 services and society $ 15,000.00
Future lost or impaired consortium,
 services and society 20,000.00

General Damages
The jury awarded the sum of $390,000.00 in general damages. Defendant Delta contends this award is excessive.
Before a Court of Appeal can disturb an award made by a jury, the record must clearly reveal the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award and then only to the extent of lowering it (or raising it) to the highest (or lowest) point that is reasonably within the discretion afforded the court. Reck v. Stevens, *467 373 So.2d 498, 500-501 (La.1979); Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976).
Here we note that the award of general damages made by the jury is excessive in that it fails to take into consideration the fact that the disability sustained by Schwamb is of indefinite duration, and thus may end quite shortly, and the fact that the medical testimony contains no hint of brain damage, although psychological injury may be an indirect result of plaintiff's accident. We also note that the award in the present case, while not limited by comparable awards, approaches the sums awarded in cases of permanent brain injury. See Palermo v. Allstate Ins. Co., 415 So.2d 437, 448 (La.App. 1st Cir.1982); Ward v. Louisiana & Ark. Ry. Co., 451 So.2d 597, 606-07 (La.App. 2d Cir.1984); Smith v. State ex rel. Dep't of Transp. & Dev., 412 So.2d 685, 691 (La.App. 2d Cir.), writ denied, 413 So.2d 907 (La.1982). Nor does the record indicate that Mr. Schwamb was in substantial pain. It is our considered opinion, after having thoroughly reviewed the record, that the maximum amount of general damages supported by the record is $290,000.00, and in the exercise of our discretion we reduce the jury's award of general damages to that amount.

Loss of Wages
The amount of lost past earnings and lost future earnings as set by the jury was in accord with testimony presented by Schwamb's expert economist. It did not constitute an abuse of the "much discretion" accorded the trier of fact in determining lost past and future earnings. See Folse v. Fakouri, 371 So.2d 1120, 1123-24 (La.1979).

Loss of Consortium
The jury awarded the sum of $35,000.00 for lost past and future consortium. The item of consortium cannot be calculated with certainty. The trier of fact has great discretion when the amount awarded is insusceptible of precise measurement. LSA-C.C. arts. 1999, 2324.1. The award of lost or impaired consortium depends in large measure upon the party's demeanor, and will not be set aside absent obvious abuse of discretion. Finley v. Bass, 478 So.2d 608, 614-15 (La.App. 2d Cir.1985). The award of $35,000.00 for lost past and future consortium in the present case seems generous to us, but we cannot say that it constitutes an obvious abuse of discretion. After a long and happy marriage of which five children were born, Mrs. Schwamb testified the parties' love life was now "nil." Mrs. Schwamb further testified that Mr. Schwamb has become grouchy and unable or unwilling to perform the many small tasks that tend to produce a happy marriage.

Interest on Damages for Future Losses
The trial court awarded interest from the date of judicial demand on all damages, even damages awarded for future losses. Delta contends that this was error, and that interest should run on damages for future losses only from the date of judgment.
Although Delta's argument is persuasive, and should perhaps be addressed to the Legislature, we find no error in the trial court's award of interest on all damages from the date of judicial demand. See LSA-C.C. art. 2924; LSA-C.C.P. art. 1921; LSA-R.S. 13:4203; Anthony v. NOPSI, 449 So.2d 666, 670 (La.App. 4th Cir.), writ denied, 450 So.2d 968 (La.1984); Schackai v. Tenneco Oil Co., 436 So.2d 729, 735 (La. App. 4th Cir.), writ denied, 440 So.2d 759 (La.1983). Compare Christy v. City of Baton Rouge, 282 So.2d 724, 729 (La.App. 1st Cir.), writ denied, 284 So.2d 776 (La.1973) (which did not discuss R.S. 13:4203).

Loss of Anticipated Profits
Schwamb contends that the jury erred in awarding him nothing for loss of anticipated profits from a proposed real estate project. He testified that prior to the accident he had made plans to build a water park, horse farm, recreational park and theme park in Tangipahoa Parish. Schwamb planned to include camping facilities, a golf course, hotels and a monorail, as well as a commuter airport and heliport.
*468 Despite these plans, none of the construction was ever begun. In fact, Schwamb had signed only a purchase agreement to purchase 411 acres of land before the accident, and an option to buy another 5000 acres after the accident. Moreover, Schwamb had received no financing whatsoever for the project. Under the circumstances, any award for "loss of anticipated profits" would have been speculative. The jury could reasonably have found that the plans for the project were not sufficiently advanced to warrant any award, or, in any case, that the project would not have been profitable. We therefore find no error.

H. EXPERT WITNESS FEES
The defendant contends that the amount of expert witness fees granted Mr. Miller and the other experts called by plaintiff to testify is exorbitant. The trial court has great discretion in fixing expert witness fees. The award must be based upon "`the value of time employed and the degree of learning or skill required.'" Labee v. Louisiana Coca Cola Bottling Co., 500 So.2d 850, 853 (La.App. 1st Cir.1986), quoting LSA-R.S. 13:3666(A). Defendant contends it was totally unnecessary for Mr. Miller to be in court for a number of days before testifying. (However, when witnesses are sequestered, it is customary to permit the expert to remain in court to aid the trier of fact with his expert opinion after hearing the other witnesses testify.) We do not find Mr. Miller's presence in court unreasonable, nor do we find it unreasonable to award a fee for the time he was required to be present in court. As to the other expert witnesses, who were physicians, we note the trial court did not accept their bills without question, and reduced the sum awarded in two instances. We hold the trial court did not abuse the broad discretion given it in fixing expert witness fees.

CONCLUSION
The jury found that Delta was solely liable for Schwamb's injuries and awarded $390,000 in general damages, $560,000 for loss of earnings, nothing for loss of anticipated profits, and $35,000 for Mrs. Schwamb's loss of consortium.
Trial court error tainted the jury verdicts as to liability; however, our own review of the record convinces us that Delta is solely liable. We find no manifest error in the jury awards concerning loss of earnings, loss of anticipated profits, and loss of consortium. However, we find the award of general damages clearly excessive and lower it to $290,000.
We also find no reversible error in the trial court rulings concerning plaintiffs' counsel's closing argument, the exclusion of two letters of compromise, jury instructions, interest on damages for future losses, and expert witness fees.
Accordingly, the judgment of the trial court is amended to reduce the award of general damages from $390,000.00 to $290,000.00 and is, as amended, affirmed. Costs are to be paid equally by Howard K. Schwamb, Jr. and Delta Air Lines.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] The Schwambs also sued Dudley Anderson, the owner of the briefcase which struck Howard Schwamb, and two other flight attendants, Gail Maloney and Charlain Hubbard Taylor. Anderson was dismissed on a motion for summary judgment because he was a co-employee in the course of his employment at the time of the incident and was therefore immune from liability. The suits against Maloney and Taylor were voluntarily dismissed before trial.
[2] Delta also made a third party demand, which it voluntarily dismissed during trial, against Heath Tecna Aerospace and McDonnell Douglas Corporation, the respective designer and manufacturer of the overhead luggage bin.
[3] Art. 1428. Supplementation of responses

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.
(Emphasis added.)
[4] See also LSA-R.S. 15:464 (expert testimony is admissible "[o]n questions involving a knowledge obtained only by means of a special training or experience"). (Emphasis added.) Compare F.R.E. 702 and Proposed L.C.E. art. 703 (expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.") (Emphasis added.)
[5] It has also been suggested that there is a danger that the jury "might forego independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness." McCormick on Evidence § 12 at 30 (Cleary 3d ed. 1984). See State v. Wheeler, 416 So.2d 78, 82 (La.1982); State v. Coleman, 486 So.2d 995, 1000 (La.App. 2d Cir.), writs denied, 493 So.2d 633, 634 (La.1986).
[6] Mr. Miller testified that he was commissioned as a Naval Aviator in the U.S. Marine Corps during World War II; he thereafter received a B.S. degree in Aeronautical Engineering from M.I.T., an M.S. degree in Systems Management from the University of Southern California, and a J.D. degree from Potomac School of Law. In satisfaction of his M.S. degree, Miller took advanced management courses, advanced engineering courses, and courses involving human factors: psychology, physiology, human engineering and statistical research. Miller had experience as a cockpit design and flight safety staff engineer and as a supervisor in four areas of engineering: safety, human factors, reliability and maintainability. He had done fourteen months of crash injury research and was a technical advisor to a full-scale transport crash test in 1983. He was a lecturer and director of research in what is now called the Institute of Safety and Systems Management, an organization that conducts educational programs on the subject of aviation safety. He had served for six years as Director of the Bureau of Aviation Safety of the National Transportation Safety Board. Since 1974, Mr. Miller has served as a private consultant in aviation safety matters.
[7] The appellate court need not find its own facts in every case. Where the weight of the evidence is so nearly equal that a first-hand view of the witnesses is essential to a fair resolution of the issues, the case should be remanded for a new trial. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980). We do not find this to be such a case.
[8] The following public address announcements were made during boarding of the aircraft: "Ladies and Gentlemen, as a safety precaution, all carry-on baggage should be placed under the seat in front of you or in an enclosed overhead bin for takeoff and landing. Should you need assistance with your luggage, please ring your flight attendant call button." A further announcement was made as the aircraft taxied to the runway: "Check to be certain all carry-on luggage is securely stowed beneath the seat in front of you or in an enclosed overhead bin."
[9] The advertisement was taken from Newsweek magazine. It depicted a suitcase falling from an overhead airplane luggage compartment onto a seated businesswoman, and was captioned: "My Financial Partner? New England Life, of course. Why?"
[10] To preserve the matter for appellate review, either the demonstrative aid itself or its photograph should be included in the record.