WICKER, Judge.
Darryl Sicarelli, his former wife, Gail, and their minor child, Neil, appeal a judgment in favor of State Farm Fire and Casualty Company, Sicarelli’s uninsured/under-insured motorist carrier, on claims arising out of Darryl Sicarelli’s accident and resultant injuries. The issue is whether or not Sicarelli’s car was struck by an unknown vehicle causing him to lose control of his automobile. The jury found in favor of State Farm and the trial judge entered judgment accordingly dismissing plaintiffs’ suit against State Farm. We affirm.
Sicarelli, an attorney, was out with clients and co-workers for drinks on the night of March 6, 1986. He started for home on West Esplanade Avenue in the direction of Kenner, driving his 1978 Corvette. He lost control of his car and struck a utility pole, resulting in the partial destruction of his frontal lobe. He was in a coma for seventy-five days after the accident. Because of his injury, he was unable to remember exactly what caused him to lose control of the car. He alleged, however, the car was hit in the rear by an unknown vehicle and that this was the cause of his accident and injuries. State Farm, his uninsured/underinsured carrier, alleged that his was the only vehicle involved in the accident and that, therefore, State Farm could not be liable for coverage on this accident.
The evidence before the jury consisted of the testimony of experts testifying to the cause of the accident, laymen, and Sicarelli himself. The jury dismissed Sicarelli’s claims, finding in favor of State Farm. Si-carelli essentially argues the jury was manifestly erroneous in the following ways:
1. In disregarding unrefutable physical evidence that an unknown vehicle struck Sicarelli’s during the accident, and
2. In accepting any portion of Raymond Burkart’s testimony, given the impeachment evidence presented at trial.
Sicarelli further specifies as error that the trial judge abused his discretion in the following ways:
1. The trial court was beyond its discretion in permitting Franklin Griffith to offer opinions outside his limited field of expertise, and
2. The trial court was beyond its discretion in permitting Monroe Samuels, M.D. to testify at trial.
In his original petition, Sicarelli alleged that a van driven by an unknown driver crossed his path, causing him to swerve, lose control of his Corvette, and hit a utility pole. He later amended his petition to allege he was struck from the rear by an unknown vehicle, causing him to lose control of his Corvette and hit a utility pole. EVIDENTIARY RULINGS:

Dr. Monroe Samuels:

Appellants argue the trial judge abused his discretion in permitting Dr.. Samuels to testify for the following reasons: (1) State Farm did not seasonably supplement its response to discovery insofar as timely identifying Dr. Samuels as an expert witness, and (2) Dr. Samuels’ testi *181 mony was based entirely on supposition and was highly prejudicial.
La.C.Civ.P. art. 1428 provides in pertinent part:
A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.
Appellants contend appellees breached the duty to supplement seasonably in violation of La.C.Civ.P. art. 1428. Through a mutual agreement between counsel the discovery cut off date was extended to January 23, 1989. Trial began January 30, 1989. On January 20, 1989 State Farm filed an amendment to its pre-trial order stating, inter alia, it would call Dr. Sam-uels as an expert in the area of the “influence of alcohol on the ability to operate motor vehicle.” The pre-trial insert was the first notification State Farm gave to appellants of its intent to call Dr. Samuels as a witness.
On January 20, 1989 appellants filed a notice of deposition seeking to depose Dr. 0. Franklin Griffith and Mr. Raymond Bur-kart on January 26, 1989.
State Farm filed a motion to quash these depositions since they were sought after the discovery cut-off date of January 23, 1989. A minute entry dated January 25, 1989 reveals the depositions were ordered to be taken. On January 27, 1989 appellants filed a notice of deposition regarding these same individuals for the new date of January 30, 1989. Dr. Samuels was not sought to be deposed at the January 30, 1989 deposition. Instead, January 30, 1989, appellants filed a notice which inter alia indicated Dr. Samuels was not timely identified and therefore his testimony should be excluded.
A motion in limine was subsequently filed February 8, 1989 seeking to preclude State Farm from offering any testimony from Dr. Samuels. Appellants state in the supporting memorandum they only learned of Dr. Samuels on the morning of January 23, 1989 and that they had no reasonable opportunity to obtain discovery from Dr. Samuels. However, although appellants sought and obtained additional deposition testimony on January 30, 1989 from Dr. Griffith and Mr. Burkart they never sought further discovery relative to Dr. Samuels.
During trial, on February 8, 1989, appellants argued the motion in limine. Counsel for State Farm stated no attempt was ever made by appellants to depose Dr. Samuels. The record supports State Farm’s position. The trial judge denied appellants’ motion to exclude Dr. Samuels as a witness.
We agree with our brothers in the First Circuit that:
a trial judge is given “great discretion in deciding whether to receive or refuse the offered testimony of witnesses and any bias must be in favor of receiving the testimony.” Coignet v. Deubert, 413 So.2d 253, 256 (La.App. 4th Cir.1982).
Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writ denied, 520 So.2d 750 (La.1988). See also Nu-Lite Elec. Whole. v. Colonial Elec., 527 So.2d 498 (La.App. 5th Cir.1988) where we accorded the trial court wide discretion in its decision to either exclude or allow evidence pursuant to a failure to seasonally supplement responses to interrogatories.
On January 23, 1989, the cut-off date for discovery, appellants had notice of the identity of Dr. Samuels as a witness and of the nature of his testimony. Although on January 30, 1989, they obtained additional deposition testimony from two other State Farm witnesses, they made no attempt to seek discovery from Dr. Samuels.
Counsel for State Farm gave no reason to the trial judge for its failure to name Dr. Samuels earlier. At oral argument, how *182 ever, counsel stated he did not plan to use Dr. Samuels until that late date when he learned Dr. Samuels would be available.
Even had State Farm breached its continuing obligation to seasonably supplement its response to discovery, appellants’ failure to seek Dr. Samuels’ deposition along with that of Dr. Griffith and Mr. Burkart or its failure to take other corrective action, constitutes a waiver of their objection on this ground. See e.g. Belk v. Montgomery Ward and Co., Inc., 501 So.2d 1008 (La.App. 2nd Cir.1987). For this reason, we find no abuse in the trial judge’s discretion in his denial of the motion to exclude Dr. Samuels’ testimony.
Appellants also objected to Dr. Sam-uels’ testifying about the effects of alcohol on Siearelli when Dr. Samuels had never seen Siearelli and could not have personal knowledge of Siearelli’s tolerance for alcohol. Appellants contend Dr. Samuels’ testimony was completely speculative and should have been excluded by the trial judge. The motion in limine argued at trial seeking to exclude Dr. Samuels’ testimony due to its allegedly speculative nature was denied by the trial judge.
In brief, appellants refer to the case of Ryan v. State, 477 So.2d 110 (La.App. 1st Cir.1985), writ denied, 478 So.2d 136 (La.1985). In Ryan the court found Samuels’ testimony was “not based on observation or proven facts, but on supposition.” Id. at 114. The Ryan court did not use the manifest error — clearly wrong standard of review on the basis that the trial judge relied totally on deposition testimony. Thus, it conducted an independent review of the record. The Louisiana Supreme Court in Virgil v. American Guarantee & Liability Ins., 507 So.2d 825 (La.1987) held the manifest error standard of appellate review applies even “when the evidence before the trier of fact consists solely of written reports, records and depositions.” Virgil at 826. We have serious reservations about relying on a case in which an appellate court made an independent determination of the competency of Dr. Samuels’ testimony in light of Virgil, supra.
More importantly, La.C.E. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
La.C.E. art. 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence. [Emphasis added].
Dr. Samuels testified as an expert pathologist specializing in forensic toxicology. He stated “I confine my work to forensic toxicology which consists of the understanding [sic] interpretation of the effects of alcohol and the various drugs of abuse as it pertains to human beings.” He further stated he had testified previously in other courts regarding the effects of alcohol on a person’s ability to drive.
Dr. Samuels stated he had reviewed the accident and ambulance run reports, the emergency room records, and the laboratory and medical reports. He specifically reviewed Sicarelli’s pathology laboratory report showing his blood alcohol test which had been introduced into evidence. The pathology report indicated a blood alcohol level of .09%.
He testified a person with that level of blood alcohol would not be able to operate a motor vehicle in a safe fashion, “regardless of prior drinking history [and] regardless of his familiarity with alcohol.” He opined a person should not drive when the blood alcohol level goes over .05%. He stated there was scientific evidence to suggest driving impairment at that level.
The Louisiana Supreme Court has held in State v. Fallon, 290 So.2d 273, 291 (La.1974):
*183 The character of the evidence upon which an expert bases his opinion is ordinarily a matter which affects the weight to be accorded the expert’s opinion. I has no bearing upon the admissibility of the evidence. Accordingly, doctors may refer to reports on the patient prepared by other doctors or nurses as a basis for their expert medical opinion. [Citations omitted],
La.C.E. art. 702 allows an expert to testify based upon “facts or data [m]ade known to him.” See also Fallon, supra. The trial judge’s conclusion that Dr. Samuels had the expertise to testify about the effects of alcohol on human beings is supported by Dr. Samuels’ testimony of having experience in that regard.
In Hunnicutt v. Kent, 434 So.2d 91 (La.App. 5th Cir.1982), writ denied, 435 So.2d 442 (La.1983) we held at 94:
The trial judge must be allowed much discretion in determining a witnesses’ qualifications and competence to testify as an expert, and the reviewing court must not disturb the trial judge’s ruling unless the error is clear and involves a misconception of law.
We find no abuse of the trial court’s discretion.

Dr. Oscar Griffith:

Dr. Griffith was accepted by the court as an expert in the field of physics. The trial judge further allowed Dr. Griffith to give “opinions as physics may relate or does relate to accident construction.” At trial plaintiffs/appellants’ counsel objected to Dr. Griffith’s testifying as an expert in the fields of accident reconstruction, mechanics, and body and fender analysis. On appeal counsel states it was error for the trial judge to allow Dr. Griffith to testify as to the cause and origin of a dent on the rear of the Sicarelli Corvette since Dr. Griffith knew nothing about Corvettes. Counsel urges it was error since identical testimony sought from Dr. Griffith relative to whether there had been contact with another vehicle was disallowed in an earlier opinion from this court.
In Trapani v. State Farm Mut. Auto. Ins. Co., 524 So.2d 226 (La.App. 5th Cir.1988), writ denied 526 So.2d 795 (La.1988) the trial court had disallowed opinion testimony from Dr. Griffith regarding whether the plaintiff’s van in that case had been hit by another vehicle. Dr. Griffith had been accepted by the court “as an expert in physics and the application of physics principles to accident reconstruction.” Trapani at 229. In Trapani we found no error in the trial’s exclusion of that testimony from Dr. Griffith. However, Dr. Griffith testified in the present case that he attended accident reconstruction school at Northwestern University approximately two years prior to the current 1989 trial. He specifically testified he had formal training at Northwestern concerning what it takes to produce damages “in vehicles in general.” We do not view Trapani as a blanket prohibition against ever allowing Dr. Griffith to give testimony relative to whether he opined the presence or absence of vehicle contact.
The trial judge in the present case did not abuse his discretion in allowing Dr. Griffith to give an opinion relative to whether there had been vehicle contact. See Hunnicutt, supra. The record supports the trial judge's conclusion Dr. Griffith had the requisite expertise to so testify-
MANIFEST ERROR:

Raymond Charles Burkart:

Counsel for appellants argues Mr. Bur-kart, an expert in accident reconstruction, “misrepresented” to the court and the jury the sources of his information. He contends Mr. Burkart’s testimony in that regard was impeached by Mr. Kenneth Persc-hall’s testimony. Counsel specifically noted Mr. Burkart testified his only source of information regarding the bumper system was “what Dr. Griffith found in a library.” Mr. Perschall, an expert in body and fender repair, however, testified that Mr. Burkart had contacted him about the damages to the Corvette.
Mr. Perschall testified Mr. Burkart wanted:
*184 to understand the characteristics of a rear bumper urathane cover on a Corvette as it has normal situations of weather and being weather beaten, that it would have waves in it, and I said yes, this is true from an old automobile or a car six, seven, eight years old, this is possible that it can get waves in a bumper. But upon an inspection I had made right after Mr. Burkart had spoken to me at Barry’s Automotive out on Airline, I was to look at the rear side of the bumper and I noticed what I had to see which was damage on the left side of the bumper that was caused from an impact. It was not a wavy bumper.
Mr. Perschall further testified he had tentatively been “hired by State Farm or by Mr. Burkart.”
The jury, as trier of fact, had discretion to accept in whole or in part the testimony of either Mr. Perschall or Mr. Bur-kart. When confronted with possible conflicting testimony whether Mr. Burkart had other sources of information on the bumper, the jury could in its discretion believe either Mr. Burkart or Mr. Perschall regarding any perceived inconsistency. “The jury can adequately assess credibility and it is the jury’s exclusive province to do so.” Schwamb v. Delta Air Lines, Inc., 516 So.2d 452, 460 (La.App. 1st Cir.1987), writ denied, 520 So.2d 750 (La.1988).
JURY FINDING NO UNKNOWN SECOND VEHICLE:
Appellants further argue “[t]he jury’s decision was manifestly erroneous given the unrefutted physical evidence and testimony establishing that an unknown vehicle collided into Mr. Sicarelli’s Corvette.”
In this case the jury was allowed to see the actual Corvette. Furthermore, it heard the testimony of conflicting experts. Greg Muggli, owner of Corvette Enterprises, a sports car shop owner, testified as an expert in the field of General Motors body work. He had seen the Corvette two weeks to a month prior to the accident, and at that time he noticed no bumper damage. When he inspected it after the accident there was a dent in the left-rear bumper. He testified the shock absorber was moved forward one to one and one-half inches as a result of considerable impact from the rear. He opined the Corvette had been struck from behind by another vehicle and that the damage to the rear was not induced damage from the car hitting the utility pole.
Scott McQuaig, Sicarelli’s co-worker at the time of the accident, testified he saw the Corvette every day and had never seen a dent in the rear. Gail Sicarelli, Siearelli’s ex-wife, testified that had there been a dent in the rear bumper Sicarelli would have informed her as he “loved that car.”
Ross Joseph Mocklin, an expert in accident reconstruction, testified. He noticed damages to the left-rear bumper. He stated it was his opinion a second vehicle
struck the Sicarelli vehicle, probably with the front left corner of the striking ve.hicle into the rear left bumper of the Corvette which induced a rotation ...
The impact caused the Sicarelli vehicle to hit the pole. He could not give an opinion as to the speed at which either vehicle was traveling. He believed the left-rear damage could not have been induced by impact with the pole.
Mr. Perschall, an expert in body and fender repair, testified he saw a damaged shock absorber on the Sicarelli vehicle which had been pushed in one to one and one-half inches. He felt it was impossible for the damage he saw to the rear to have been caused by hitting the side of the vehicle on a telephone post.
He testified the second vehicle’s speed would have been 35 miles-per-hour greater than that of the Sicarelli vehicle in order to cause the shock absorber to be pushed in to that extent. He stated there would be no damage to the shock absorber simply because the metal frame would be distorted around the pole.
Donald Frisbi, a claims superintendent for State Farm, testified that he had an appraisal in April, 1986 indicating damage to the rear bumper of the vehicle. The appraisal indicated replacement cost of the rear bumper cover to be $516.00.
*185 Officer Mark Dupuis testified when he investigated the accident that night there was no other vehicle present. He measured two of three skid marks. He measured the two which went all the way to the Corvette. One was 140 feet long and the other was 130 feet long. He saw no scuff marks on the street or debris indicating impact with another vehicle. He would have looked for such signs. He calculated Siearelli’s speed at 55 miles-per-hour prior to impact. The speed limit in that area was 35 miles-per-hour. Although he became aware at some later date of a dent to the rear he could not testify as to when the dent occurred. He could not testify as to the cause of the accident.
Mr. Burkart, an expert in accident reconstruction, opined there was no impact from a second vehicle. Instead,
the accident involved a one vehicle collision, the driver went onto the grassy area of the servitude of the road, right side; left side was on the blacktop. He applied brakes and rotated counter-clockwise for approximately a hundred feet, a hundred and thirty feet and impacted with a utility pole.
Furthermore, he examined the vehicle. He stated he
looked at the damage that was to the rear of the vehicle and noted that the taillights were not broken, the bumper that surrounds the taillights is designed for a five mile per hour impact; other than the dimpling there was no evidence of impact. There was no scarring or flaking of the paint in that area. There was slight damage in the upper left corner which would be consistent with a vehicle backing into a pole or a fence, a pole with a fence. There was also an exact dimpling in the front of the vehicle, almost straight through ...
The bumper, the construction of the bumper has like a shock which is built to absorb a five mile per hour impact. That shock was relatively undamaged ... the seal had not been broken. You didn’t see the erasure of the paint all the way through. It wasn’t fully compressed. It did have a small bit of compression which led me to believe that it probably had impacted with a pole or some object like that and there was also some deformity of the frame and since that shock is connected to the frame, that would cause dimpling also.
The outer skin of a Corvette is fiberglass, relatively flexible material[,] which would dimple or. bend in conformity with the frame bending also.
Mr. Burkart, and Dr. Griffith, calculated the speed of the Corvette to be a minimum of 57 miles-per-hour. Mr. Burkart stated the car skidded about 135 feet before it hit the pole. “When he impacted with the pole he was doing twenty to thirty miles per hour.”
He further testified that had there been an impact from the rear the Sicarelli vehicle would have hit a preceding utility pole instead of the pole it struck. He was positive of that opinion since he and Dr. Griffith ran a computer program which provided that simulation.
The dimple he saw in the left rear measured approximately one-fourth to one-half inch. He saw a twisted shock absorber. He stated
it’s twisted ’cause it was bolted to the frame and when the frame — when the Vette hit the pole and the frame twisted, since it was bolted to the frame it twisted with it and that in my opinion contributed to the dimpling.
He felt the damage to the left-rear was probably the result of a combination of pre-existing damage, such as hitting a post, and induced damage from striking the pole. When he saw the car it was not “showroom finish” as he had been told, but had nicks and dents, including a dent on the right front corner of the bumper.
Dr. Griffith, an expert in physics and physics as it relates to accident reconstruction, testified there was no evidence of the involvement of another vehicle. He was certain no vehicle struck the Corvette from the rear. He stated all of the skid marks shown in the police photographs came from the Sicarelli vehicle. Both he and Mr. Bur-kart performed tests which were videotaped and which showed a single vehicle *186 sliding into a skid as did the Sicarelli vehicle without the necessity of an impact from another vehicle.
He further stated had there been impact from another vehicle the skid marks would have appeared differently since
[a]n impact of significance results in a jog or an offset in the skid marks that are being laid down so that if the impact had taken place along the distance over which we seek skids, there would’ve been a definite change of — a sudden change of the direction of the marks ...
He inspected the car. He referred to the damage at the left-rear of the vehicle as a “dimple” or “pucker”. He stated the “dimple” was caused as a result of the impact with the utility pole. He explained:
when you view the underside of the vehicle you can see that everything is compressed or pressed to the side. The frame members are compressed. The drive wheels are offset a number of degrees ... the back wheels don’t point in line with the vehicle anymore. There’s a significant difference.
So these types of distortions don’t just stop where the pole stopped. They ... traveled throughout the frame structure and body structure.
He also looked at the underside of the vehicle. He did not find any damage representative of an impact with another vehicle. He discovered a twisted flange of the shock absorber but opined any damage on the outside or the underside of the car was induced by contact with the utility pole and not from being struck from the rear by another vehicle. It resulted from distortion or induced damage by the frame being bent.
At oral argument counsel for plaintiffs/appellants stated he asked Dr. Griffith questions regarding the size of the shock absorber and that Dr. Griffith was “dead wrong” when he indicated a size which was less than twice the size of a Corvette shock absorber which Mr. Persc-hall later identified. Counsel argues that Dr. Griffith was not a credible witness. However, Dr. Griffith admitted at trial he never took measurements of the shock absorber and could not be sure of its size. When presented with an exhibit of a smaller shock absorber than that found in a Corvette he stated only that “[i]t looks approximately the size.” As previously noted, “[t]he jury can adequately assess credibility and it is the jury’s exclusive province to do so.” Schwamb, supra at 460.
More importantly, there is nothing in the record indicating that Dr. Griffith’s opinion regarding whether there had been a second vehicle was premised on the measurement of the shock absorber. The jury could have correctly concluded his opinion did not hinge on such a measurement.
Recently the Louisiana Supreme Court has stressed the importance of the well-settled standard to be applied to the jury’s factual findings. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989):
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La.1978); A. Tate, “Manifest Error” Further observations on appellate review of facts in Louisiana civil cases, 22 La.L.Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even *187 though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra [365 So.2d] at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985).
* * ⅜ ⅝ * *
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Canter, supra [283 So.2d] at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La.1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999, 1001 (La.1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300, 301 (La.1979). Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. See, Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir.1983), writ denied, 443 So.2d 586 (La.1983). Cf. State v. Mussall, 523 So.2d 1305 (La.1988); Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); U.S. v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. See, Jackson v. Tate, 428 So.2d 882, 884 (La.App 1st Cir.1983), citing McDonald v. Book, 215 So.2d 394 (La.App. 3d Cir.1968), overruled on other grounds, Celestine v. Hub City Motors, Inc., 327 So.2d 700 (La.App. 3d Cir.1976). Cf. Anderson, supra, 470 U.S. at 575, 105 S.Ct. at 1512; Schexnider v. McDermott International Inc., 868 F.2d 717, 720 (5th Cir.1989); Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 770 (5th Cir.1989); U.S. v. Hibernia National Bank, 841 F.2d 592, 595 (5th Cir.1988); Hanson v. Veterans Administration, 800 F.2d 1381, 1388 (5th Cir.1986).
The record amply supports the jury’s conclusion there was no rear-end collision by a second vehicle. Its decision to give greater weight to the testimony of Dr. Griffith and Mr. Burkart than to the testimony of Mr. Perschall, Mr. Muggli, or Mr. Mocklin is not manifestly erroneous or clearly wrong.
Accordingly, for the reasons stated the judgment dismissing the claims of plaintiffs/appellants is affirmed at their cost.
AFFIRMED.